MABEL S. TALBOT *vs.* TOWN OF LITTLE COMPTON *et als.*

MAY 20, 1932.

PRESENT: Stearns, C. J., Rathbun, Sweeney, Murdock, and Hahn, JJ.

RATHBUN, J. This bill in equity was brought for the nominal purpose of obtaining a decree restraining a con-

tinuous trespass to real estate. The real purpose of the action is to try the title to the land in question. The Superior Court entered a decree declaring title to be in the complainant and the cause is here on the respondents' appeal from said decree.

The bill alleges that complainant has title to and possession of said land; that after she posted the land the town sergeant, by direction of the town council of the respondent town, entered upon the land and removed the signs forbidding trespass. The respondents in their answer deny the allegations of the complainant that she has title to and possession of said real estate and that any trespass has been committed. They further allege that the town of Little Compton has the title to the land and that there are two public ways across the same.

The real estate in question consists of a narrow strip of beach land, situated in said town, approximately 1,000 feet in length and containing a trifle more than two acres. The land is bounded on the west by land of the complainant's husband, Fred E. Talbot, on the north by Tunipus Pond,—the northeast corner being about opposite to the southeast corner of said pond and the southwesterly corner of land formerly owned by one Sisson—on the east by land apparently owned by the Tunipus Realty Company and on the south by the Atlantic Ocean. The land, which is entirely composed of sand, gravel and rocks, has no herbage except a small amount of beach grass around the edge of said pond.

It is clear that the complainant brought this bill to obtain a determination of the validity of her claim to the land and that the respondents have consented to this proceeding in equity.

Ordinarily courts of equity will not enjoin trespass to land when the parties are in dispute as to the title. In *Rogers* v. *Rogers*, 17 R. I. at 625, this court said: "There can be no question that an action of ejectment is the ordinary, proper,

and adequate remedy for settling a disputed title, and that courts of equity are not instituted to try issues that may be determined at law." See also *McKittrick* v. *Bates,* 47 R. I. 240; 1 Pom. Eq. Juris. 4th ed. § 177; 14 R. C. L. 450; 32 C. J. 122; note in 32 A. L. R. 502. However, if the respondent raises no objection, courts of equity will sometimes take jurisdiction where the title is in dispute and, if the parties frame issues for that purpose, title to the real estate, as between the parties, will be determined. 32 C. J. 124; *Matthews* v. *Colburn,* 102 N. E. (Mass.) 941. Perhaps one reason why equity courts have in such cases consented to take jurisdiction where the dispute between the parties involves title to real estate is because the respondent has not been deprived of a trial by jury, by requiring him, over his objection, to litigate the dispute in a court of equity.

The complainant contends that the trial of this cause should be governed by the technical rules of pleadings applicable to a trial of a law action in trespass *quare clausum fregit;* and that, therefore, the respondents have, by pleading title in themselves, admitted that the complainant has possession of the land. No authority is cited in support of this contention. In "Words and Phrases" will be found a definition of *liberum tenementum* as follows: "In legal effect the plea admits possession in the plaintiff sufficient to enable him to maintain the action against the wrongdoer and asserts a freehold in the defendant, with right to immediate possession as against plaintiff. On the filing of this plea, defendant must prove his title either by deed or other documentary evidence, or by an actual adverse and exclusive possession for 20 years, since by the issue he undertakes to show a title in himself by which the presumption arising from plaintiff's possession will be avoided." The bill alleges that the complainant owns the land and discloses that the respondents not only make claim to certain rights and interests in the land but assert the right to do the acts complained of. Issues were framed by stipulation between the parties.

The respondents by pleading title in themselves did not intend to admit possession in the complainant, and we find no reason for holding that by pleading title in themselves they should be deemed to have admitted possession in the complainant. The suit being in equity, the ordinary rules governing trials of causes in equity govern. The complainant is seeking to have the question as to title determined. The burden of proof is upon her, and all defenses are available to the respondents. If the complainant is to prevail she must recover on the strength of her own title and not on the weakness of the respondents' title. *Tripp* v. *Ide,* 3 R. I. 51; *Smith* v. *Haskins,* 22 R. I. 6. In 9 R. C. L. 843 the rule was stated as follows: "It is well established that if the plaintiff in an action of ejectment or in the nature thereof relies on a record or paper title, he must show a regular chain of title from the government, or from some grantor in possession, or from a common source from which each of the litigants claims. No length of chain or paper title which does not reach the sovereignty of the soil is sufficient in itself to constitute *prima facie* evidence of title. There must, in addition, be proof that satisfies the jury that at least one of the grantors in this chain of deeds had been in possession of the premises, where the chain does not reach back to the sovereignty, before the defendant in possession can be required to defend his possession." In *Baxter* v. *Brown,* 26 R. I. 381, the plaintiff, suing in ejectment, proved a good paper title back to 1812. The defendant showed a paper title back to 1869 and actual possession of the land. The court held that defendant had failed to establish title by adverse possession and also that the plaintiff had not established a superior record title. The court said: "Against the plaintiff's title, shown at the trial, . . . it is not derived from the government nor from a common source with the defendant's title, nor from or through any persons shown to have been in actual possession of the land. . . . The rule that a good title is one which goes back either to the government or to some one who has had actual possession of

the land, or to some one whose title is acknowledged by the defendant, is recognized in 10 Amer. & Eng. Ency. Law, 2d ed. 484, and is supported by the numerous cases there cited. The following statement seems to us more applicable than those cited by the plaintiff: 'When title is shown to have been derived successively from the original owner, it is accompanied with a right to possession which secures to the apparent owner the constructive possession and the right to recover it by ejectment, from a person withholding it without title.' "

The complainant traces her paper title, by a line of conveyances, back to July 9, 1849, when Michael Mosher conveyed to Beriah C. Manchester. This is insufficient to establish a presumption of possession and title. What is her proof as to possession? At one time Thomas Brayton, to whom conveyance was made in 1865, erected a fence across a narrow corner of this land near the western boundary thereof to prevent his cattle from wandering away beyond that point. The fence was promptly destroyed. It is contended that said Brayton on one or two occasions objected to the taking of sand and gravel from certain parts of the beach, but it does not appear that anyone was prevented from or interrupted in carting sand and gravel from any portion thereof. His son, George Brayton, was accustomed to drive his father's cows across the beach when they had wandered away from a farm in Westport. Fred E. Talbot, the complainant's husband, on a few occasions cleaned up rubbish on the beach and the complainant and her friends used the beach for bathing, as did others who cared to do so. The complainant has not attempted to exclude the inhabitants of the town from free use of the beach. The conveyances to the complainant were made in 1924, and when she attempted to exercise dominion over the land a dispute arose which resulted in this more or less friendly bill to determine the rights of the parties. The town at all times openly carted gravel from the beach for use on the highways of the town. Surveyors of the town cleared the

beach of rubbish. At times stones were removed by them from the road extending across the land. One surveyor at the direction of the town council removed the snow from this way. One surveyor from 1899 to 1913 annually carted from this beach a large amount of gravel for use on the highways and also each spring during said period cleared said way of stones. Often the gravel was dug on one part of the land and stored in another place on the same land until required for use on the highways. One surveyor was accustomed to take as many as eight or ten loads per day during the time he was engaged in repairing the highways of the town. All this was done over a very long term of years, openly and under claim of right. It is clear that the farmers residing in the town, very generally, acting under a claim of right, carted sand in large quantities from this beach. Many of them took from forty to fifty loads annually.

There is no evidence tending to support the finding of the trial justice that the complainant held a title acquired by adverse possession. See *New Shoreham* v. *Ball,* 14 R. I. 566. On the other hand the great weight of the evidence shows that the town openly, notoriously and uninterruptedly used the entire tract under a claim of right for a length of time far in excess of the statutory period for obtaining title by adverse user. There might be some question if only an occasional load had been taken from the beach, but the amount taken by the town was so large and the taking was so regular and for such a long period of time that any person having a claim of title, if he gave any attention whatever to the matter, would have known the use was hostile and under a claim of right. In addition to taking sand the inhabitants of the town were accustomed to resort to this beach in great numbers for hunting, fishing and bathing. The use by the inhabitants was consistent with the claim of the town that it held title for the use of all its inhabitants. It does not appear that anyone paid taxes on this land except for one year when the land was assessed to the complainant. It is settled that assessors of taxes have no au-

thority to make an admission of title against the town. The complainant therefore acquired no title by the payment of taxes. *City of Providence* v. *Comstock,* 27 R. I. at 555; *Armour & Company* v. *City of Newport,* 43 R. I. at 221.

The mere taking of sand and gravel would be consistent with only a right of *profit à prendre,* but we think that the use has been consistent only with the legal title in the town.

In the early Colonial days the territory comprising Little Compton was under the jurisdiction of Plymouth Colony, and the parties agree that the land in question was acquired by the original proprietors of Little Compton by deed of Constant Southworth, dated April 29, 1675. These early proprietors constituted a legal unit quite similar to a municipal corporation. *Monumoi* v. *Rogers,* 1 Mass. 159. In 1674 this body of proprietors had, by decree of the Plymouth Court, been given the status of a township. In 1682, after the proprietors acquired title, said body by decree of said court became a township "with the same liabilities of a town as the other towns of the Colony" with the name of Little Compton. By royal decree dated May 28, 1746, the town came under the jurisdiction of Rhode Island.

If the original proprietors did not allot the land in question, we think it was their intention and the intention of the Colony that the town should succeed to all their rights therein. There is no evidence tending to show that they did allot or convey said land. The respondents by a process of elimination have attempted to show that the proprietors never conveyed the land. Although we think they have failed in this, as no one who had searched the title so testified, there is considerable evidence tending to indicate that the land was never conveyed. An examination of the early plat indicates that the land was not appurtenant to any land platted and set off. The land was waste land and formed a convenient road for travel between different sections of the large platted area. By reason of the two ponds lying at the north of this narrow beach a right of passage over the land was reasonably necessary. Again a brook ran

from each pond across the narrow beach to the ocean. It is reasonable to suppose that the proprietors intended that all the inhabitants should have free access to each of these brooks for the purpose of catching fish which come from the sea to spawn in fresh water. However, as we have said, proof that the early proprietors never parted with title is incomplete. Nevertheless, the use by the town has been sufficient for an acquisition of title by adverse user. Such long and continued user raises a presumption of dedication. 8 R. C. L. 903; *Hughes* v. *P. & W. RR. Co.,* 2 R. I. 493; *Daniels* v. *Almy,* 18 R. I. 244; and where there is a dedication, express or implied, of common lands the municipality holds the title to the land in trust for the inhabitants and the public. *Cascambas* v. *City of Newport,* 45 R. I. at 348.

The appeal is sustained and the decree appealed from is reversed. The parties may present a form of decree to be entered in the Superior Court.

*Curran, Hart, Gainer & Carr, Henry C. Hart,* for complainant.

*Burdick, Corcoran & Peckham, Abbott Phillips, Roger T. Clapp,* for respondents.