Jan REITSMA et al.

v.

## PASCOAG RESERVOIR & DAM, LLC.

No. 2000–306–Appeal.

Supreme Court of Rhode Island.

June 20, 2001.

Michael L. Rubin, Alan Shoer, Providence, Joseph S. Larisa, Jr., for Plaintiff.

Barry J. Kusinitz, John B. Webster, Warwick, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

Can the state government involuntarily divest owners of private property other than by eminent domain or by condemnation? Yes, we hold, because, like private parties, the government itself can acquire an easement by prescription or title by adverse possession over property that was otherwise privately owned during the period of the taking. To do so, it must establish actual, open, notorious, hostile, and continuous use of the property under a claim of right for ten years, as required by G.L.1956 § 34–7–1. *See, e.g., Talbot v. Town of Little Compton,* 52 R.I. 280, 286, 160 A. 466, 469 (1932) (holding that municipality, on behalf of the public, "openly, notoriously and uninterruptedly used the entire tract [of a beach] under a claim of right for a length of time far in excess of the statutory period for obtaining title by adverse uses").

In this case, acting through an executive department now known as the Department of Environmental Management, the state [1] built a boat ramp in 1965 on a waterfront lot that it acquired in 1964. The property and the boat ramp abutted an artificially created body of water called Echo Lake in Glocester. Although the record does not reveal exactly when it did so, the state also erected and maintained signs near the boat ramp that purported to regulate the public's use of the lot, the ramp, and the lake. At all times material to this case, the defendant corporation, Pascoag Reservoir & Dam, LLC (corporation)—or one of its predecessors in title—has been Echo Lake's owner of record. For thirty-two years, from 1965 through 1997, the state maintained and operated its lakeside property so that members of the public could

park their vehicles there and then use the ramp as a point of access to the lake for various recreational activities, including boating and fishing. Over that period, innumerable members of the public and other lakeside property owners have used the ramp as a means of access to the lake for such purposes—without interruption, objection, or interference by the corporation or by any of its predecessors in title. Not until 1997—when it posted a "NO TRESPASSING" sign—did the corporation—or, for that matter, any of the lake's previous owners—communicate any objection to the state's or to the public's use of this boat ramp as a means for boats to access the lake for recreational purposes.

Nevertheless, a Superior Court trial justice—after reviewing the evidence in a nonjury trial—rejected the state's claim to having adversely possessed the lake-bottom property beneath the boat ramp and to having acquired, on behalf of the public, a prescriptive easement to the use of the ramp for lake access. The court concluded that the state's placement of a substantial portion of the ramp on the bottom of the lake and the public's use thereof had been merely permissive. More specifically, the trial justice found that the state had failed to prove by clear and convincing evidence that the collective or individual use of the ramp for access to the lake had been pursued under a claim of right or that it was in any way hostile, open, notorious, or adverse to the interests of the lake owners. For the reasons prescribed below, these conclusions, we hold, were clearly erroneous and, therefore, must be reversed.

### Facts and Travel

We reproduce, in pertinent part, the facts and travel of the case, as found by

1. Throughout this opinion, we shall refer collectively to the named plaintiffs herein—Jan Reitsma, in his capacity as director, Rhode Island Department of Environmental Manage-ment, and Sheldon Whitehouse, Attorney General of the State of Rhode Island—as "the state."

the trial justice and included in his decision of the case:

"The following facts are generally not in dispute. Pascoag Reservoir, also known as Echo Lake, is an artificially created body of water and is located in the towns of Burrillville and Glocester, Rhode Island. The lake covers between 355 and 387 acres of water surface and is over two miles in length and has over ten miles of shoreline.

"The lake is ringed by approximately 300 private homes, two for-profit businesses and two camps for children operated by religious organizations.

"In 1964, the state purchased a lot abutting the lake of approximately one and three quarter acres. In 1965 the State constructed a boat ramp facility to permit members of the public to launch boats from the ramp onto the lake.

"The State has continuously owned and maintained this boat ramp facility to the present day.

"The boat ramp itself is 30 feet wide with a 12 foot traction surface. It is 48 feet long, 38 feet of which is submerged at ordinary high water. There is also a 'prop-wash zone,' an additional area which extends 6 feet outward from the submerged end of the traction surface and which lies on the lake bed under water.

"The defendant Corporation has claimed ownership of the lake since 1983. The Corporation's predecessors in title who created the lake, did so in 1860 upon lands purchased or owned by the Corporation's predecessors in title and flooded by a dam to create the lake.

"Said predecessors in title were an association of mill owners who created the lake to provide power to its mill interests in the area.

"These predecessors in title maintained the dam, # 016, and controlled the level of the lake uninterruptedly from the lake's creation to its sale to the Corporation in 1983, lowering the lake in winter and raising the lake in summer.

"Since 1983 the Corporation has been assessed real property taxes on the lake by both the towns of Burrillville and Glocester.

"Since 1983 the Corporation has continually paid the taxes levied by both towns and has conducted the maintenance and upkeep of the lake since its purported ownership in 1983.

"Lakefront property owners have been using the lake for swimming, boating and fishing for a substantial period of time.

"Members of the general public, as well as lakefront land owners, have accessed the lake via the State owned and maintained boat ramp since its construction in 1965.

"The State owned boat ramp facility provides the only public access venue for the public to access the lake for boating, fishing, and swimming—and is utilized in summer—and to a lesser degree, in winter for winter related activities.

"On or about July 28, 1997, the Corporation erected a 'no trespassing' sign in the vicinity of the State's boat ramp. In a letter dated July 30, 1997, the Corporation notified the State that it was 'withdrawing any express or implied permission to use the reservoir. No further access by the general public should be permitted through the boat ramp.'

"Other issues arose during this time frame which caused a justice of this Court to issue an order temporarily restraining the Corporation from altering the water levels of the lake without permission from the State's Department of Environmental Management."

In addition, the trial court found as follows:

"In support of its claim that the general public has gained a prescriptive easement for the recreational use of the lake for boating, swimming, and fishing; the State produced at least twelve witnesses to testify at trial from its total of 21 witnesses called. These witnesses testified to years of unfettered access to the lake both prior to and subsequent to the construction of the boat ramp. The witnesses came from the ranks of waterfront lot owners, persons who operated for-profit businesses on, or dependent upon the lake, persons who operated profit and nonprofit campgrounds along the shores of the lake and other members of the general public who came from afar who testified to their use of the boat ramp and the lake itself for fishing, swimming, and the like.

"The witnesses collectively testified that they never sought nor received permission to use the lake or were in any way prohibited or limited in their use of the lake for the recreational purposes customarily engaged in on a lake of this type. The witnesses testified to long years of usage and familiarity as well as shorter more infrequent uses. Many lakefront dwellers testified that the boat ramp was their only means of access to the lake either because of the configuration of their lots or the size of their boats. The State also provided testimony that the value of the lakefront lots, including those sold by the Corporation over the years, was enhanced by the accessibility of the lake either via the boat ramp or the waterfront lots."

After the corporation posted its no-trespassing sign in 1997, the state filed a complaint and petition for injunctive relief against the defendant corporation. The state alleged violations of the Freshwater Wetlands Act, G.L.1956 §§ 2–1–18 through 2–1–24, and asserted that it had acquired an easement to the lake by virtue of, *inter alia,* the doctrines of easement by prescription and adverse possession. The corporation soon answered and filed a counterclaim alleging inverse condemnation, trespass, and violations of its substantive due process rights pursuant to the federal and state constitutions and 42 U.S.C. § 1983. Over the corporation's objection and in response to the state's motion to do so, the court severed the state's allegations pertaining to the violations of the Freshwater Wetlands Act from the rest of this case. The trial justice also voluntarily dismissed the corporation's inverse condemnation claim, without prejudice. Thereafter, at the conclusion of the trial, it entered a partial final judgment in favor of the corporation under Rule 54(b) of the Superior Court Rules of Civil Procedure. The state has appealed from this judgment.

### Analysis

We have long recognized that "one who claims an easement by prescription has the burden of establishing actual, open, notorious, hostile and continuous use under a claim of right for ten years as required by * * * § 34–7–1." *Burke-Tarr Co. v. Ferland Corp.,* 724 A.2d 1014, 1020 (R.I.1999) (quoting *Palisades Sales Corp. v. Walsh,* 459 A.2d 933, 936 (R.I. 1983)). "Furthermore, although each element must be established by clear and convincing evidence, * * * '[n]o particular act to establish an intention to claim ownership is required. It is sufficient if one goes upon the land openly and uses it adversely to the true owner, the owner being chargeable with knowledge of what is done openly on his land.'" *Id.* (quoting *Greenwood v. Rahill,* 122 R.I. 759, 763, 412 A.2d 228, 230 (1980)); *see also Talbot,* 52 R.I. at 286, 160 A. at 469 (explaining that

where use "was so [substantial] and * * * so regular and for such a long period of time that any person having a claim of title, if he gave any attention whatever to the matter, would have known the use was hostile and under a claim of right").

■ In other words, a claim of right to own or use property will arise by implication through objective acts of ownership that are adverse to the true owner's rights, one of which is to exclude or to prevent such use. When confronted with such an open, unsolicited, and long-continued use of the property, the true owner must *affirmatively communicate* either objection or permission to stop the statutory prescriptive period from running. Mere acquiescence or silence, however, in the face of uses that are inconsistent with the true owner's property rights, does not constitute permission. Thus, in *Burke–Tarr*, we reversed this same trial justice's attempt to rely upon the true owner's alleged silent permission for the laying of a pipeline across the property to defeat a prescriptive easement. There we held that:

"an inference of permissive use, which would defeat the element of hostile use, cannot properly be drawn from the lone fact that the parties entered into a written lease [for a portion of the area that did not include the area over which a prescriptive easement was claimed.]. * * * Moreover, we have found no evidence that [the property owner] objected to [the claimant's] installation [of a pipe], or its continuous use, at any point prior to the expiration of the lease. * * * [W]e conclude that there is no suggestion that this pipe, although installed in full view of [the property owner], was done so with her permission." *Burke–Tarr Co.*, 724 A.2d at 1019–20.

■ The facts in this case supporting the existence of a prescriptive easement are even stronger than they were in *Burke–Tarr*. In contrast to *Burke–Tarr*, here the state did not possess a written lease giving it permission to install a boat ramp on any portion of the privately owned lake, nor was there any agreement between the state and the owner that would have allowed the public to obtain access to and to use the lake from the state's boat ramp for any purpose. Thus, no inference of permission from the lake owner could be drawn from the mere fact that it allowed the use to continue. On the other hand, as in *Burke–Tarr*, no evidence indicated that any owner ever had affirmatively granted permission to the state to use the property in the manner that it was used. Moreover, no evidence showed that any lake owner ever had objected either to the state's installation of the boat ramp or to the continuous use thereof by the public to access the lake—at least not any point before the running of the prescriptive period in 1975 or at any time thereafter until 1997. Thus, following *Burke–Tarr*, we conclude that there is no evidentiary support for the trial justice's finding that this ramp and the public's access to the lake therefrom, "although installed in full view of [the property owner], was done so with [its] permission." *Id.*, 724 A.2d at 1020.

Other state courts have employed similar reasoning to find that the government has acquired property prescriptively. For example, in *Garrett v. Gray*, 258 Md. 363, 266 A.2d 21 (1970), a state appellate court reversed a trial court ruling against the public in a prescriptive-easement case, holding that:

"The chancellor dismissed the user by the many witnesses who testified below as 'permissive use.' However, we think the use would more appropriately be characterized as use by 'acquiescence.' * * * 'Mere failure to protest is not permission but acquiescence.' * * * 'Acquiescence is the inactive status of

*quiescence or unqualified submission to the hostile claim of another, and is not to be confused with permission, which denotes a grant of permission in fact or a license.'"* *Id.* at 27–28. (Emphasis added.)

*See also Swift v. Kniffen,* 706 P.2d 296, 303–04 (Alaska 1985) ("The sort of permission which would negate the claim of an adverse user is not mere acquiescence because: [T]he whole doctrine of title by adverse possession rests upon the acquiescence of the owner in the hostile acts and claims of the person in possession."); *Davis v. Wilkinson,* 140 Va. 672, 125 S.E. 700, 702 (Ct.Spec.App.1924) (explaining that acquiescence does not constitute "legal permission"; "[f]ailure to object to the use" constitutes acquiescence, not permission).

 Although the public can itself acquire a prescriptive easement by open and continuous adverse use, *see, e.g., Swift,* 706 P.2d at 305 ("[A] public easement may be acquired by prescription."); *Opinion of the Justices,* 139 N.H. 82, 649 A.2d 604, 610 (1994) (stating that general public may acquire easement by prescription to coastal beach land), a state or municipal government, or one of its subdivisions, also can acquire a prescriptive easement over otherwise private property, on behalf of the public, whether or not the public alone could do so. *See Buffalo River Conservation & Recreation Council v. National Park Service,* 558 F.2d 1342, 1344–45 (8th Cir.1977) (holding that public may obtain prescriptive easement to use private stream); *Talbot,* 52 R.I. at 286, 160 A. at 469; *City of Jacksonville v. Horn,* 496 So.2d 204, 209 (Fla.Dist.Ct.App.1986) ("[L]egally organized or political entities, as distinguished from the unorganized general public, may acquire an easement by prescription or title by adverse possession. * * * [A] city or county represents

the public in the establishment of such an easement."); *Hollywood, Inc. v. Zinkil,* 403 So.2d 528, 535 (Fla.Dist.Ct.App.1981) (upholding municipal prescription of beach on behalf of public); *Daley v. Town of Swampscott,* 11 Mass.App.Ct. 822, 421 N.E.2d 78, 82 (1981) ("There is no doubt that a municipality may acquire an easement by prescription to use land located within its limits for a specific public purpose."); *Granite County v. Komberec,* 245 Mont. 252, 800 P.2d 166, 171 (1990) (finding that "County has a prescriptive right to the road" on behalf of public); *Beach v. City of Fairbury,* 207 Neb. 836, 301 N.W.2d 584, 586 (1981) (finding that city acquired prescriptive sewer easement); *Nice v. City of Marysville,* 82 Ohio App.3d 109, 611 N.E.2d 468, 470 (1992) ("A municipal corporation or city may acquire title by adverse possession."); *Koontz v. Town of Superior,* 746 P.2d 1264, 1266 (Wyo.1987) (holding that governmental body could acquire title to land by adverse possession or right to use land by prescription); *State ex rel. Meek v. Hays,* 246 Kan. 99, 785 P.2d 1356, 1363 (1990) (stating that doctrine of prescriptive easements for public highways extends to streams and rivers, and stressing that official action is required for public to obtain prescriptive easement for recreational purposes).

 In *Talbot,* a town, on behalf of the public, claimed the right to a contested beach area. The beach owner in *Talbot,* like the lake owners here, possessed paper title to the land in dispute (in that case, an extended beach area). As here, the property owner in *Talbot* never attempted during the prescriptive period to exclude the public from freely using the privately owned property in question. 52 R.I. at 283, 160 A. at 467. The town and farmers residing in the town openly carted gravel from the beach, removing many loads over a period of years. As here, neither the

government nor the public believed they were trespassing in their use of the property. Like the use of the lake through the boat ramp, the beach and its store of gravel in *Talbot* were "openly, notoriously and uninterruptedly used * * * under a claim of right for a length of time far in excess of the statutory period * * *." *Id.* at 286, 160 A. at 468–69. Moreover, in both *Talbot* and in this case, the public's right to use the property stemmed from ostensible governmental authorization to do so. In *Talbot* the public used a beach for recreation that was maintained by the government; here, the public used a boat ramp that had been built and maintained by the state for the public to obtain access to and use the lake for recreation.[2]

■ Given the factual findings of the trial justice and the above-referenced law, we are constrained to conclude that the state's 1965 construction of the boat ramp (a substantial portion of which was located upon and in the lake bed) and its subsequent maintenance of this structure during its uninterrupted use by the public over the next thirty-two years—was open, actual, notorious, hostile, adverse, continuous, and—given the state's objective acts of ownership and the public's highly visible use of the ramp to obtain access to the lake—accomplished under a claim of right as a matter of law. Indeed, there was no evidence whatsoever at trial that any owner of the lake' ever had objected to the construction, maintenance, or public use of the ramp until 1997. Permission to engage in such a use of the lake was never sought by the state; and permission, express or implied, was never given for it to build or maintain the physical boat-ramp structure that rested in large part on the owner's lake bed. As such, the state's thirty-two year maintenance of a portion of its boat ramp upon the lake bed amounts to a classic case of adverse possession.[3] *See, e.g., DelSesto v. Lewis,* 754 A.2d 91, 94–95 (R.I.2000) (explaining the doctrine and its application); *Anthony v. Searle,* 681 A.2d 892, 897–98 (R.I.1996) (same); *Gammons v. Caswell,* 447 A.2d 361, 367–68 (R.I.1982) (same).

■ Accordingly, we conclude that the trial court clearly erred when it found that the "record is devoid of any evidence provided by the state to indicate that the construction of said ramp was hostile, notorious or adverse or constructed under claim of right to the portion of the lake bed occupied by the submerged portion of the boat ramp." The court erred by failing to find that the very act of openly placing a permanent physical structure on another's property without the true owner's permission and maintaining it there for more than ten years is *itself* an action

---

**2.** The trial court attempted to distinguish *Talbot* on the ground that the underlying record ownership of the property in that case was in question, whereas, in this case, the lake owners always held clear record title to the lake bed. This issue, however, was neither critical nor even relevant in deciding that case. Indeed, *Roche v. Town of Fairfield,* 186 Conn. 490, 442 A.2d 911, 917 (1982), expressly relied upon *Talbot v. Town of Little Compton,* 52 R.I. 280, 160 A. 466 (1932) in upholding a municipality's right to continue public use of a beach. In *Roche,* there was no question concerning the record ownership of the property. The private party had an undisputed chain of title dating to the nineteenth century.

Nonetheless, the Connecticut court, citing *Talbot,* ruled in favor of the municipality's claim based upon adverse use. *Roche,* 442 A.2d at 917. Thus, the existence of a clear record title with respect to the servient estate is irrelevant to the adverse user doctrine.

**3.** The applicable period for adverse possession or prescriptive easement is ten years. *See* G.L.1956 § 34–7–1; *see also Burke–Tarr Co. v. Ferland Corp.,* 724 A.2d 1014, 1020 (R.I.1999); *Jerry Brown Farm Association, Inc. v. Kenyon,* 119 R.I. 43, 48–49, 375 A.2d 964, 967 (1977).

that is so inconsistent with the true ownership of that property that it is therefore notorious, adverse, hostile, and under claim of right as a matter of law. *See Anthony,* 681 A.2d at 897–98 (finding adverse possession by placement of physical structures on disputed property and open use of structures); *Gammons,* 447 A.2d at 367–68 (explaining that ultimate fact to be proved in adverse possession case is whether the claimant has acted toward the land in question as would an average owner); *Greenwood,* 122 R.I. at 763, 412 A.2d at 230 (finding prescriptive easement in favor of the state for water flowing over another's property).

We hold that in the absence of evidence of a knowing trespass or of express permission from any owner, the construction and maintenance of a physical structure on another's property will be deemed to be accomplished under a claim of right because "[n]o particular act to establish an intention to claim ownership is required. It is sufficient if one goes upon the land openly and uses it adversely to the true owner, the owner being chargeable with knowledge of what is done openly on his land." *Greenwood,* 122 R.I. at 763, 412 A.2d at 230 (finding no permission and no objection until after ten years); *see Anthony,* 681 A.2d at 898 (using and cultivating land and erecting structures for statutory period sufficient for finding of adverse possession); *Gammons,* 447 A.2d at 368 (finding claim of right through mere use and improvement of disputed land).[4]

Indeed, adverseness and hostility have been inferred from the mere *use* of another's property without that owner's communicated permission to do so. *See, e.g.,*

*Taffinder v. Thomas,* 119 R.I. 545, 551–52, 381 A.2d 519, 522–23 (1977) (finding use of property over boundary line for statutory period sufficient for adverse possession); *LaFreniere v. Sprague,* 108 R.I. 43, 50–51, 271 A.2d 819, 823 (1970) (holding that mistaken use of another's property for statutory period sufficient for adverse possession); *Talbot,* 52 R.I. at 286, 160 A. at 469 (deeming use of beach adverse and hostile). Here, for thirty-two years the state's boat ramp served as the public point of access to the surface of the lake for many recreational activities by an innumerable multitude of persons. Thus, the trial court's holding that the state did not, through adverse possession, acquire the right to keep and maintain the boat ramp for public use of the lake must be reversed.

Further, the public's use of the lake through the state boat ramp was continuous from its inception to well past the ten-year prescriptive period. Indeed, it had been continuous even through to the filing of the present lawsuit. Nevertheless, the trial court found that the evidence of continuous use was insufficient. Thus, the trial justice stated that "the evidence produced gives this Court no indication of how many people actually use or used the ramp to gain access and with what frequency. It isn't clear whether 2 or 200 citizens utilized the ramp to gain access and with what frequency. There is no record of daily, weekly or monthly use." But "[t]he test is not the number of persons actually using it, but the character of the use,— that is, whether or not the public, generally, had the free and unrestricted right to use the road." *Feldker v. Crook,* 208 Ill.

---

4. In *LaFreniere v. Sprague,* 108 R.I. 43, 50–51, 271 A.2d 819, 823 (1970) and *Paquin v. Guiorguiev,* 117 R.I. 239, 243, 366 A.2d 169, 171 (1976) this Court rejected the minority rule that an adverse possessor must have entered upon a private landowner's property with a specific, self-conscious knowledge that such possessor's own conduct was adverse to another's ownership interest.

App.3d 1012, 153 Ill.Dec. 888, 567 N.E.2d 1115, 1124–25 (1991). Here, the undisputed evidence established that, since the installation of the state's boat ramp, the public's use of it to obtain access to the lake was "unfettered" and continuous, such that it could not be characterized as haphazard or casual. *Cf. Talbot,* 52 R.I. at 286, 160 A. at 469 (holding that the town's use was so substantial and regular as to support adverse possession); *Catalano v. Town of Windham,* 133 N.H. 504, 578 A.2d 858, 862 (N.H.1990) (holding intermittent use sufficient to establish prescriptive rights to general public when consistent with character of easement claimed); *Luevano v. Maestas,* 117 N.M. 580, 874 P.2d 788, 793–94 (Ct.App.1994) ("[F]requency of use or number of users is unimportant, it being enough if use of the road in question was free and common to all who had occasion to use it as a public highway.") (quoting *Discher v. Klapp,* 124 Ind.App. 563, 117 N.E.2d 753, 757 (1954)); *Town of Sparta v. Hamm,* 97 N.C.App. 82, 387 S.E.2d 173, 176–77 (1990) (holding that continuous use of road by public, even though slight, and maintenance of road by town, however poorly, for prescriptive period was by claim of right and sufficiently hostile for town to establish a public prescriptive easement).

The trial court itself found that "[m]embers of the general public, as well as lakefront land owners, have accessed the lake via the State owned and maintained boat ramp since its construction in 1965. The State owned boat ramp facility provides the only access venue for the public to access the lake for boating, fishing, and swimming—and is utilized in summer— and to a lesser degree, in winter for winter related activities." Indeed, the trial court noted that multiple

"*witnesses testified to years of unfettered access to the lake* both prior to and subsequent to the construction of the boat ramp. The witnesses came from the ranks of waterfront lot owners, persons who operated for-profit businesses on, or dependent upon the lake, persons who operated profit and nonprofit campgrounds along the shores of the lake and other *members of the general public who came from afar who testified to their use of the boat ramp and the lake itself for fishing, swimming, and the like.*" (Emphases added.)

The court further acknowledged that "[m]any lakefront dwellers testified that the boat ramp was their only means of access to the lake either because of the configuration of their lots or the size of their boats." Given these factual findings, it matters not that the state was unable to establish precisely the exact number of lake users or the exact frequency of their use of the boat ramp to obtain access to the lake.

In sum, the evidence clearly established that (allowing for seasonal variations) untold numbers of the public, including lakefront residents, had used the state's boat ramp facility continuously from 1965 to 1997 to launch boats into Echo Lake and then used the lake itself for fishing, waterskiing, swimming, and related recreational activities. Indeed, it was the only facility on this lake affording such public access. Moreover, the extent of the public's "years of unfettered access to the lake" certainly was not haphazard or casual.

Thus, the trial court erred when it found that the public's use of the lake "has been permissive through the assent of both the defendant corporation and its predecessors in title." Other than the owners' silent acquiescence, no evidence of this permission existed and none was communicated to the state or to any user. For example, no user of the ramp testified to any permission to use the lake received from any

lake owner or from any of its predecessors. Even the trial court acknowledged that the "witnesses collectively testified that they never sought permission to use the lake * * *." Yet the Court's decision states that, "[i]n support * * * of the claim that the Corporation had allowed permissive use of the lake for recreational and other purposes and retained in itself all aspects and rights of ownership in the lake bed and upon the water of the lake, the defense, through Mr. Mesolella, introduced a number of documents * * *." It further notes that "[a] series of letters from the Corporation's predecessor in title to various lakefront landowners, businesses, and organizations were introduced as exhibits to attempt to establish a record of continuous active and affirmative control of the lake from 1937 through 1983 when the Corporation came on the scene, and from 1983 to the present day * * *." The trial court concluded that these documents proved that the lake owner had given permission to the users, thereby defeating the State's claim.

But none of these letters related in any way to the state boat ramp itself or to the public's use of it to obtain access to the lake. Indeed, none of the letters even mentioned the boat ramp. Moreover, only two of the letters were directed to the state, and those two exceptions were dated before the state acquired the boat-ramp lot. After examining the evidence in the record, we are persuaded that the trial court's permissive-use conclusion was totally unsupported by the evidence. Thus, we conclude, it constituted clear legal error and must be reversed.

Finally, although the corporation voluntarily dismissed its inverse condemnation claim without prejudice, it still complains on appeal that the state's conduct in this case constitutes a "first step in a land grab unrivaled within recent jurisprudence." It then urges this Court to prevent the state from acquiring private property in this manner without first invoking its eminent domain power and without paying the owners the just compensation required by the federal and state constitutions for such takings of private property. But our conclusions concerning the state's adverse possession of the lake bed and its acquisition of a prescriptive easement to obtain access to the lake on behalf of the public. are not meant to condone or to condemn the state's conduct in this regard. Indeed, we express no opinion on the propriety of its actions vis-à-vis its initial construction of the boat ramp and, thereafter, its maintenance thereof so that the public could obtain access to the lake via the ramp. Nor do we determine whether it could have been required to pay just compensation to the owners for any such taking that may have occurred.

■ Nevertheless, even assuming, without deciding, that the corporation and/or its predecessors in title would have possessed viable just compensation and/or trespass claims in response to the state's actions in constructing the boat ramp and in allowing the public to obtain access to the lake via that ramp, such claims long ago would have lapsed because of the owners' failure to initiate a timely action asserting such claims and because of their failure otherwise to interpose a timely objection to the state's conduct before the prescriptive ten-year period expired (or, for that matter during any potentially applicable limitations period thereafter). See, e.g., United States v. Dickinson, 331 U.S. 745, 749, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789, 1794 (1947) (applying six-year statute of limitations to an inverse condemnation suit arising out of government-flooded property and holding that the statute of limitations on the takings claim began to run when "the consequences of [the] inun-

dation have so manifested themselves that a final account may be struck").

"Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time." *Id.* at 748, 67 S.Ct. at 1385, 91 L.Ed. at 1794.

▮ Thus, the corporation's arguments concerning an alleged unconstitutional "taking" ultimately rest upon the premise that no statute of limitations bars the constitutional right of every property owner to obtain just compensation for the government's taking of the owner's property. But this argument garners no support from the relevant cases of the United States Supreme Court on this subject. *See,* e.g., *Texaco, Inc. v. Short,* 454 U.S. 516, 530, 102 S.Ct. 781, 792–93, 70 L.Ed.2d 738, 751–52 (1982) ("[T]his Court has never required the State to compensate the owner for the consequences of his own neglect. * * * It is the owner's failure to make any use of the property—and not the action of the State—that causes the lapse of the property right; there is no 'taking' that requires compensation."); *Soriano v. United States,* 352 U.S. 270, 271, 77 S.Ct. 269, 270, 1 L.Ed.2d 306, 308 (1957) (applying six-year statute of limitations in inverse condemnation suit); *accord, Dickinson, supra.*

Furthermore, other states that have addressed this issue have adopted each state's statutory period for adverse possession as a statute of limitations for inverse condemnation actions. *See Krambeck v. City of Gretna,* 198 Neb. 608, 254 N.W.2d 691, 695 (1977) (adopting ten-year adverse-possession statute of limitations); *Brazos River Authority v. City of Graham,* 163 Tex. 167, 354 S.W.2d 99, 109–10 (1961) (adopting ten-year adverse possession statute of limitations); *Ackerman v. Port of*

*Seattle,* 55 Wash.2d 400, 348 P.2d 664, 667 (1960) ("[A]n action for constitutional taking * * * may be brought at any time before title to the property taken is acquired by prescription.").

In sum, even if the state's conduct from 1965 to 1975 had been unlawful and amounted to an improper taking of the lake owner's property without paying just compensation, and even if the lake owner's property had not been taken in the constitutional sense until the prescriptive period ended in 1975—issues that we have no need to decide in this case—the corporation and its predecessors failed to assert any takings claim in a timely manner. Thus, they are barred from asserting them now under any statute of limitations that possibly could apply to such claims—even if, arguendo, they did not begin to accrue in this case until the prescriptive period in question ended in 1975.

## Conclusion

We hold that, consistent with controlling case law, and by clear and convincing evidence, the state proved its case at trial, showing that it had acquired a portion of the lake bottom by adverse possession and that it had acquired, on behalf of the public, a prescriptive easement to use the boat ramp to obtain access to the lake for boating, fishing, swimming, and for other recreational purposes. Hence, we sustain the appeal, vacate the Superior Court's judgment, and remand the papers in this case to that court with instructions to enter judgment for the state consistent with this opinion. Given our disposition of this case, we have no need to pass upon the state's alternative estoppel theory, and, therefore, we decline to do so.

GOLDBERG, Justice, with whom Justice LEDERBERG joins, dissenting.

I respectfully dissent from the decision of the majority finding that the state es-

tablished, by clear and convincing evidence that it had "acquired a portion of the lake bottom by adverse possession and that it had acquired, on behalf of the public, a prescriptive easement to use the boat ramp to access the lake for boating, fishing, swimming, and for other recreational purposes." I do not believe that the majority has clearly defined the extent of the burden it has placed upon the servient estate. In my opinion the result in this case is the creation of a recreational easement upon the lake, with access through the boat ramp, to be enjoyed by anyone. I do not believe the facts in the record support such a broad grant that amounts to a prescriptive easement for recreational use on property indisputably held in private hands and for which the state never had claimed an interest and did so only after it was foiled in its attempts to purchase the lake.

A declaration of adverse possession of a portion of the lake bottom, coupled with a prescriptive easement to use the boat ramp should not amount to a recreational easement in the waters of the lake. Rather, a prescriptive easement to use the boat ramp merely provides for boat access to the lake and should not include the right to engage in any specific activity and certainly should not provide for any other access except the launching of boats. Further, in light of this Court's obligation to create the least burdensome easement possible, the facts established at trial demonstrate that only abutting property owners and their legitimate customers and guests have used the boat ramp on a consistent basis and, in my opinion, the infringement should be restricted to the abutters. At best, the state failed to establish prescriptive use by anyone but actual abutters and legitimate occupiers of land abutting the lake. Indeed, the state produced only a single witness who was not an abutter who testified that he used the boat ramp for

bass fishing on a sporadic basis. Every other user of the reservoir who testified in support of the state's claims in this trial was an abutter or a customer of a commercial abutter. *Bentel v. County of Bannock,* 104 Idaho 130, 656 P.2d 1383, 1386 (1983) ("prescriptive easements are strictly limited to the actual use which gave rise to the easement"); *Firebaugh v. Boring,* 288 Or. 607, 607 P.2d 155, 157 (1980) (citing 5 Restatement of *The Law of Property* § 447 (1944); 3 R. Powell, *The Law of Real Property* § 416 (1979); 2 G. Thompson, *Real Property* § 349 (1961) ("the scope of the privilege of use arising from [a prescriptive] easement as against the owner of the servient tenement" is limited by the use which created it)); 25 Am. Jur.2d *Easements and Licenses* § 93 (1996) (when a "right of way is established by prescription, it is limited to the actual user * * * [a] use may be allowed [its] natural expansion in accordance with the purpose of the easement, but no greater burden may be placed on the servient estate." A right of way by prescription is bounded by a line of reasonable enjoyment); *see also McCullough v. Waterfront Park Association, Inc.,* 32 Conn.App. 746, 630 A.2d 1372, 1379 (1993) (citing *Kuras v. Kope,* 205 Conn. 332, 533 A.2d 1202 (1987) (stating that when an easement is created by prescription it must be reasonable and the least burdensome possible on the servient estate)); *and Klar Crest Realty, Inc. v. Rajon Realty Corp.,* 190 Conn. 163, 459 A.2d 1021, 1026 (1983) (quoting *Kaiko v. Dolinger,* 184 Conn. 509, 440 A.2d 198 (1981) ("[a] prescriptive right cannot be acquired unless the use defines its bounds with reasonable certainty")).

It is axiomatic that one who obtains a right to pass and repass over the land of another does not ordinarily possess the right to conduct a specific activity or activities over the land by virtue of his right to

traverse an easement. In my opinion, the decision of the majority amounts to a prescriptive easement for recreational use in this lake, a situation not favored in the law. *See* 25 Am.Jur.2d *Easements and Licenses* § 45 at 615 (1996) ("Prescriptive [easements] * * * are not favored in the law, since they necessarily work corresponding losses or forfeitures of the rights of other persons").

It should be noted that the state claimed a recreational easement in the entire lake by virtue of "(1) riparian rights, (2) navigability and the public trust doctrine, (3) prescription, (4) adverse possession and (5) dedication has been interfered with [*sic* ]." The state's proof failed miserably on a number of issues. First, although the state indicated both at trial and again at oral argument and the trial justice declared that the state was not litigating the rights of the so-called riparian owners and was only pursuing the rights of the public, the state nonetheless attempted to litigate the issue of riparian ownership rights. However, the evidence adduced at trial firmly established that these abutters for the most part,[5] have no right to the shores of the lake because defendant corporation owns the land surrounding the lake and these properties merely abut the land of defendant corporation. Moreover, as defendant's evidence established, the wharves that serve these properties and where many of these recreational vessels are moored during the season were, in fact, constructed with the express permis-sion of defendant's predecessor and extend into the lake at the sufferance of defendant. Indeed, although many of these witness-landowners may enjoy a right to launch their boats from the state's boat ramp after today, they ultimately may find they have no wharf at which to dock them. Secondly, the state presented no evidence respecting its public duty and navigability claims. Thirdly, the state's rather convoluted dedication claim was rejected by the trial justice out of hand. The state posited that, by virtue of the fact that the defendant corporation conveyed some waterfront lots, it made an implied dedication of the reservoir for public purposes, with an acceptance by the "public" of this dedication, similar to the dedication of streets in a subdivision. The trial justice appropriately noted that "[d]edication is an exceptional and unusual method of passing title to [an] interest in land" and will not be inferred from mere permissive use of unenclosed land. The trial justice concluded that the state produced no evidence that the landowner intended to offer the reservoir to the public and denied the claim. The state has not pursued this argument on appeal.[6] Accordingly, the issues that are appropriately before this Court do not include a recreational easement and ought to be strictly limited to whether the placement and use of the boat ramp amounts to a prescriptive easement for boat access only.[7]

Further, I disagree with the majority's reliance on a selective portion of the trial

---

5. This situation may be different with respect to those owners who acquired lots directly from the defendant corporation.

6. This claim has been transmuted into an estoppel argument, not raised below, that the combination of public use and overt acts by the private landowner that give rise to reasonable reliance amounts to an estoppel that works to preclude defendant from denying the public nature of the reservoir. Obviously, the issue is not appropriately before the Court and flies in the face of the state's assurances that it was not litigating the rights of the lakefront owners.

7. Indeed, the state acknowledges this in its brief when it cites to the testimony of John O'Brien, the deputy chief in the Division of Fish and Wildlife who testified that the purpose of the boat ramp was to provide boating access to the water.

justices decision entitled "facts and travel" as the controlling findings in this case. With respect to the adverse possession claim the trial justice made the following findings of fact and conclusions of law in this case:

### Findings of Fact and Conclusions of Law

"The [c]ourt, in its consideration of the claims that the State has achieved for itself and for the general public, an easement by prescription in, on, over and across the full length and breadth of the lake, makes the following findings of fact and conclusions of law based on its careful consideration of the credible evidence, exhibits, and testimony heard at trial and the entire record. That the lake is owned in fee simple by the Corporation, holding good, valuable and exclusive title in and to the waters of the said lake, the lake bed or land over covered by the waters of the lake and the dam designated as Rhode Island Dam # 016. That the lake is an artificially created body of water made by and for the exclusive purposes of the Corporation's predecessors in title in 1860.

"That the State has failed to prove by a preponderance of the credible evidence in a clear and convincing fashion that the public or any individual member of such public has gained or achieved any right, title or interest in the lake for any purpose whether by prescriptive easement or adverse possession.

"The [c]ourt finds that no witness for the State, or the general public, has proven by clear and convincing evidence that their collective or individual use of the lake was pursued under a claim of right or was in any way hostile, open, notorious, or adverse to the interests of the Corporation. The [c]ourt also finds that in the absence of such proof and in the face of the overwhelming credible evidence provided by the documentary evidence introduced at trial by the defense, that the Corporation is the owner of said lake as aforesaid, and that any use engaged in by any member of the public of the lake, whether swimming, boating, or fishing was done at the sufferance of, and with the permission of, the Corporation and its predecessors in title from the time of its lake's [sic ] formation to the withdrawing of said permission by the defendant in 1997.

"The [c]ourt further finds that the State has failed to prove by a preponderance of the clear and convincing evidence that the State has achieved for itself an easement by prescription, over, on, or in the lake.

"The State's witnesses have established only those contacts which are incidental to the normal and legitimate authority of the sovereign such as patrolling the lake to enforce the laws of the State, issuing permits for the use of the State boat ramp, periodic maintenance and repair of the boat ramp and the stocking of some species of fish on an occasional basis and inspection of the dam # 016.

"The [c]ourt finds that the State's assertion or claim of right to either adverse possession or a prescriptive easement to the lake is of recent vintage, well within the ten years required by law to establish a claim of that nature and that fact notwithstanding, the State in no aspect of this case established by clear and convincing evidence that its claim of interest in either the lake, lake bed, or dam, were in any way made under a claim of right, hostile, or adverse to the owner Corporation or its predecessors in title from the construction of the boat ramp to the present."

This case is nothing more than a failure of proof on the part of the state that bore the heavy burden of establishing, by clear and convincing evidence that it possessed a portion of the lake bottom and had acquired a prescriptive easement to use the lake for recreational purposes and that its possession was open, notorious, hostile and under a claim of right for the full statutory period. *See Burke–Tarr Co. v. Ferland Corp.*, 724 A.2d 1014, 1020 (R.I.1999); *Palisades Sales Corp. v. Walsh*, 459 A.2d 933, 936 (R.I.1983). It is fundamental that one who claims an interest in land through adverse possession bears a heavy burden of proof. *See Donnelly v. Cowsill*, 716 A.2d 742, 748–49 (R.I.1998) (actual, open, notorious, hostile and continuous use under a claim of right must be proven by clear and convincing evidence in order to establish an easement by prescription); *see also Palisades Sales Corp.*, 459 A.2d at 936; *Altieri v. Dolan*, 423 A.2d 482, 483 (R.I.1980); *Martineau v. King*, 120 R.I. 265, 268, 386 A.2d 1117, 1119 (1978); *Jerry Brown Farm Association, Inc. v. Kenyon*, 119 R.I. 43, 51, 375 A.2d 964, 968 (1977); *Russo v. Stearns Farms Realty, Inc.*, 117 R.I. 387, 391, 367 A.2d 714, 716–17 (1977); *Foley v. Lyons*, 85 R.I. 86, 90, 125 A.2d 247, 249 (1956); *and see Daniels v. Blake*, 81 R.I. 103, 109–10, 99 A.2d 7, 10–11 (1953) ("the admitted friendly relations between respondent and complainants while the latter were openly using the strip to pass to and from the shore and before they asserted the existence of a public easement tends to establish their use originally as merely permissive. We also think that the occasional passing of others to and from the shore was use of the same kind and not such as was calculated to put the title owner on notice that such passing was an adverse user under a claim of right"); *Earle v. Briggs*, 49 R.I. 6, 8, 139 A. 499, 500 (1927) (permissive use cannot ripen into an easement by prescription no matter how long it is continued); *Tefft v. Reynolds*, 43 R.I. 538, 542, 113 A. 787, 789 (1921) (the law presumes that a use originally permissive continues in the absence of conduct clearly indicating a change). Further, this Court has previously stated that,

> "[U]nless the evidence also shows that [passers over a disputed strip of land] were adverse in the beginning they cannot avail these complainants in establishing a public easement by prescription. A use originally permissive cannot be converted into an adverse use by a later use and claim of that kind. The law presumes that a use originally permissive continues in the absence of conduct clearly indicating a change. * * * And such permissive use cannot ripen into an easement by prescription no matter how long it is continued." *Daniels*, 81 R.I. at 109–10, 99 A.2d at 10–11.

There is simply no evidence in this case that demonstrates that the construction of the boat ramp was adverse at its inception.

The majority's reliance on *Talbot v. Town of Little Compton*, 52 R.I. 280, 160 A. 466 (1932) and *Burke–Tarr Co.*, 724 A.2d 1014 (R.I.1999) is incorrect and misplaced. Significantly, contrary to the majority's conclusion, *Talbot* did not involve a prescriptive easement. Rather, the complainant, under the guise of a suit in equity to restrain a trespass was in actuality attempting to establish her own title to the disputed strip of land. Her efforts to establish record title failed because she was unable to demonstrate that she, not the town and the general public, actually possessed the property. The Court never declared a prescriptive easement on behalf of the town or anyone else; in reversing the decree of the trial court, this Court declared that legal title to the property rested with the Town of Little Compton on the ground that the town originally was

under the jurisdiction of Plymouth Colony in the Commonwealth of Massachusetts and the land in question "was acquired by the original proprietors of Little Compton by deed of Constant Southworth, dated April 29, 1675." *Talbot,* 52 R.I. at 287, 160 A. at 469. Further, the Court held that these proprietors were eventually given the status of a township named Little Compton, that eventually, in 1746, came under the jurisdiction of the State of Rhode Island. The Court noted that there was no evidence that the town ever conveyed the land to anyone and considerable evidence "tending to indicate that the land was never conveyed." *Id.* Additionally, by way of *dicta,* the Court noted that the continuous and significant use of the beach by the town was also sufficient to establish an acquisition of title by adverse user, including a presumption of dedication of the common lands that the municipality held title to, in trust, for its inhabitants and the public. Significantly, the Court rejected the finding of the trial justice that the complainant held title acquired by adverse possession because "the great weight of the evidence shows that the town [and not the complainant] openly, notoriously and uninterruptedly used the entire tract under a claim of right for a length of time far in excess of the statutory period for obtaining title by adverse user." *Id.* at 286, 160 A. at 468–69. I fail to see how this case has any relevance to the case at bar in which title to the lake has never been challenged, the state does not hold any title to this property, and the trial justice specifically found that the placement of the boat ramp was done with the permission of defendant's predecessors.

I also disagree with the majority's reliance on *Burke–Tarr Co.* as support for concluding that "[t]he facts in this case supporting the existence of a prescriptive easement are even stronger than they were in *Burke–Tarr Co.*" To begin with, the easement in *Burke–Tarr Co.* was for a six-inch underground pipe to supply water to Ferland's entire apartment complex. There was no question that this installation was permanent and would be in constant use. Additionally, defendant had an existing right of way into the property under which most of the pipe was situated, with only a portion inadvertently extending under the leased seven and one-half-foot strip. Further, the plaintiff who negotiated the lease with Ferland testified at trial and never disputed Ferland's claim of right to install the subterranean water line. At best, the plaintiff indicated that she was aware that a water line was installed under the existing right of way before it was repaved in accordance with the agreement of the parties. The trial justice rejected the claim of prescriptive easement and found that the installation "was at all times known by [Burke–Tarr] and was effected with [Burke–Tarr's] tacit knowledge and consent," and that she therefore "acquiesced to its location through the existence of the lease," thereby defeating Ferland's claim of prescriptive easement. *Burke–Tarr Co.,* 724 A.2d at 1017, 1019. We rejected this finding for two reasons, first, the lease did not provide for the installation of subterranean drains and pipes and an inference of permissive use, which would defeat the element of hostile use, "cannot properly be drawn from the *lone fact* that the parties entered into a written lease for the seven and one-half foot strip of land," (emphasis added) nor was plaintiff's "testimony that she was aware that a water line was being installed is not sufficient to establish that the water line was installed with her express or implied permission." *Id.* at 1019. Significantly, the plaintiff never disputed Ferland's claim of right to install the water line under its own right of way, nor did she testify that the waterline was installed

with her permission. This is inapposite to the case before us, in which the state never made a claim of right nor did it present a scintilla of evidence that its construction of the boat ramp was hostile. Indeed, like the situation in *Talbot*, the evidence is quite to the contrary.

The trial justice found, and I wholeheartedly agree, that the state failed miserably in its attempt to meet its burden of proof. This failure, in my opinion, occurred because there is no evidence that the state did anything on that lake without the permission of the owners, express or implied. Indeed the trial justice specifically found as a fact that,

"the reasonable inferences to be drawn from the evidence adduced at trial as provided from testimony of the State's primary witnesses * * * regarding the construction and maintenance of the boat ramp over some 32 years is that, until the controversy arose regarding the lake, generally in 1996–1997, the State asserted no right or property interest in the portion of the lake bed covered by the submerged portion of the boat ramp. There is no evidence that the State ever asserted or exercised any rights adverse to the owner of the lake bed."

It is understandable that a fact-finder would wonder why the State of Rhode Island, the sovereign and the repository of all documents dealing with state property, including the construction of a boat ramp, could not produce a single piece of paper referring to this project. This is particularly telling when respondent has produced reams of solid evidence demonstrating that the lake owners jealously guarded their ownership of the lake and enjoyed a long-term, friendly and permissive relationship with the state through the plaintiff's predecessor agency. Significantly, as the trial justice noted, in 1938, the chief of the State Division of Fish and Game Department of Agriculture and Conservation, wrote to the owners of the lake concerning the low water level of the reservoir during a period when the dam was undergoing repairs and expressed his concern that the owners, like his agency "would be most anxious that nothing takes place in ponds or streams *over which you had jurisdiction* that would tend to destroy the fish life that makes up such a great part of the recreation for a large number of people." (Emphasis added.) In their reply, the owners assured the state agency that the lake over which they had jurisdiction would be restored to its previous level after the necessary repairs were made to the dam. Further, the trial justice noted the numerous documents evidencing the fact that the corporation's predecessor in title frequently granted permission to use the lake to individuals and groups that established a continuous record of active and affirmative control of the lake from 1937 through 1983 and informed the plaintiff or its predecessor of these grants. The trial justice referred to a series of letters that were introduced into evidence, establishing that abutting landowners frequently requested permission of the owners to construct retaining walls or wharves in front of their property, but on land controlled by the corporation, and noted that the response from the corporation to each request clearly outlined the rights retained by the corporation. Included in these exhibits are letters written in 1953 in which the owners reluctantly denied several requests for permission to construct retaining walls and wharves on various properties surrounding the reservoir, and concluded that if the water level in the reservoir was increased to the extent of the corporation's flowage rights, abutting property would be adversely affected. The owners' rationale for refusing these requests was:

"The dam at Pascoag Reservoir was built for the sole purpose of storing water to be used for industrial purposes by the several mill sites who own and control the operation of the Reservoir. The Reservoir Corporation has never relinquished any of its flowage rights which it has held since 1860 although we have tried through the years to be very considerate of the campers around the Reservoir, but all of them would be well advised to always keep in mind the prime purpose of the Reservoir."

Thus, as of 1953, there was no question that the owners were cognizant of the full extent of their ownership rights and had every intention of asserting those rights when appropriate. Further, in 1962, three years before the construction of the boat ramp, the owners of the lake wrote again to the State Division of Harbors and Rivers (the same state agency that purchased the lot in 1964 and erected the boat ramp in 1965) and indicated that, as the entity that controls the water rights of the Pascoag Reservoir, permission had been given to the Pascoag Ski Club to hold an exhibition of water skiing events at the Reservoir on August 26, 1962.[8] The abundant evidence in the record that clearly demonstrated that the owners of the lake routinely granted permission to members of the public to use the reservoir for recreational purposes, defendant's permissive relationship with the state and the lack of any evidence supporting the state's position led the trial justice to draw the only reasonable inference in this case: that the placement of the boat ramp and the collective and individual use of the reservoir was not done under a claim of right but rather these activities were done with the permission of the owners, thereby defeating the state's claim of adverse possession and prescriptive easement.

This Court frequently has held that a trial justice sitting as a fact-finder is charged with the duty to draw inferences from established facts and that his or her "conclusion will be accepted by this [C]ourt if the inference he [or she] drew was reasonable even though other equally reasonable inferences might have been drawn." *Jerry Brown Farm Association, Inc.,* 119 R.I. at 51, 375 A.2d at 968; *see also Belliveau Building Corp. v. O'Coin,* 763 A.2d 622, 626 (R.I.2000) (espousing the well-settled principle that this Court will not disturb the findings of fact of a trial justice sitting without a jury in a civil matter unless such findings are clearly erroneous or unless the trial justice overlooked or misconceived material evidence); *see DiLuglio v. Providence Auto Body, Inc.,* 755 A.2d 757, 765 (R.I.2000); *Paradis v. Heritage Loan and Investment Co.,* 701 A.2d 812, 813 (R.I.1997) (mem.); *Harris v. Town of Lincoln,* 668 A.2d 321, 326 (R.I. 1995); *Gross v. Glazier,* 495 A.2d 672, 673 (R.I.1985); *Lisi v. Marra,* 424 A.2d 1052, 1055 (R.I.1981). Here, the majority is rejecting this very reasonable inference drawn from the overwhelming proof in favor of defendant and instead, drawing its own inference to support the desired result. This is contrary to our established precedent and, based on the failure of the state's proof in this case, is not warranted. *See Providence & Worcester Co. v. Exxon Corp.,* 116 R.I. 470, 485–86, 359 A.2d 329, 338 (1976) (trial justice's conclusions will be accepted by this Court if the inference was reasonable, even if other equally reasonable inferences could be drawn).

Accordingly, the trial justice found that the state had failed to meet its burden of

---

8. The trial justice found this exhibit to be in direct contradiction to a witness for the state "who testified that he was involved in these ski exhibitions for three years and never sought or received permission from the Corporation to hold these water ski events."

establishing by clear and convincing evidence, the actual, open, notorious, hostile and continuous use under a claim of right on behalf of the general public simply by virtue of a boat ramp constructed in 1965 and the fact that people who resided around the reservoir used the ramp to launch their boats. The trial justice rejected the state's claim of an easement by prescription in light of the well-accepted rule that prescriptive rights are not favored in the law because they work a forfeiture on the rights of landowners. Here, the trial justice found that the state failed to demonstrate that the placement and use of the boat ramp was by claim of right. Indeed, he found it to have been at the sufferance of the owners and further found that the state failed to produce any evidence to the contrary. The record is clear that not a single witness testified about the circumstances that led to the construction of the boat ramp, and no witness even suggested that its placement or the use of the lake by the public was by claim of right. Indeed, a fair reading of the record in this case suggests that the state was stunned by the voluminous documentary proof offered by the respondent establishing a long history of beneficence toward the abutters and the public to use and enjoy the reservoir. Tellingly, the argument by the state sums up the result the majority has reached today:

> "Well, the mills have gone south and times have changed, so what is the economic utility of this [reservoir] now? It's to support residential subdivision along the shores."

In my opinion, the owner should be compensated.

Finally, the trial justice also appropriately concluded that the state's claim of a prescriptive easement is of recent vintage and was the result of unsuccessful efforts to reach an amicable resolution between defendant and the state with respect to a prospective purchase of the lake coupled with the state's demand that defendant undertake a multimillion-dollar dam rehabilitation project. The trial justice noted that in 1998, the state dam inspector sent a letter to the attorney for the corporation, noting that respondent was the owner and/or operator of the dam and included a series of recommendations for the maintenance of the dam. The state also sent a pamphlet entitled "Dam Ownership, Responsibility and Liability," which forewarned defendant that any problem with the dam would result in the imposition of strict liability for damages.

On April 22, 1998, a temporary restraining order was entered in the Superior Court, enjoining and restraining the corporation from any unauthorized alterations of the freshwater wetlands on the property surrounding the reservoir without prior approval of DEM, including but not limited to draining the water from the reservoir and returning the gate of the dam to its previous setting. A supplemental restraining order was entered on April 27, 1998, ordering that DEM be given access to the gate of the dam, and the gatehouse, no more than twice per day for inspection purposes. On June 30, 1998, a justice of the Superior Court gave respondent the full responsibility to regulate the gates of the dam and insure that the reservoir maintained a specified water level at all times. On August 13, 1999, that same justice of the Superior Court entered a temporary restraining order enjoining and restraining the corporation from interfering with the operation of the gate of the dam, thereby preventing respondent from raising or lowering the water level in the reservoir. Further, on July 8, 1998, a preliminary injunction was granted ordering the corporation to maintain a particular water level from March 1 to October 15, and another level was to be maintained

for the remainder of the year. On October 28, 1998, the trial justice found that respondent was in violation of the July 8, 1998 order and ordered the corporation or its agents to manipulate the gates of the dam to reduce the water level for the reservoir to achieve and maintain a particular water level. All these orders were entered at the instance of the state and were intended to maintain the water level in the reservoir at a level conducive to boating activities during the spring and summer and to drain the reservoir during the winter for the convenience of the abutters. Thus, respondents have been placed in the unenviable position of bearing strict liability for any damage resulting from a failure of the dam, have been burdened with an easement for recreational boating over the entire lake and because of this easement, have been precluded from draining the lake to avoid these hazards. This is the very situation that the corporation sought to avoid, as evidenced by letters dating as early as the 1950's, in which the corporation expressed concerns about people infringing on their property rights without permission, thus imposing liability on the corporation. The result created by the majority amounts to a taking by the state without compensation.

In his conclusion, the trial justice stated,
 "It is well recognized by this [c]ourt that Echo Lake, so called, has played an important role in the lives of many citizens of Rhode Island. This [c]ourt has determined that its use by the public has been permissive through the assent of both the defendant Corporation and its predecessors in title. Private property rights are among the most important and hallowed rights enjoyed by citizens of this State. It is beyond this [c]ourt's authority to deprive a private landowner of the rights inherent in ownership because a landowner has chosen to allow others to benefit from his property. To

do so would be to penalize the generosity of private landowners."

I agree with the findings of the trial justice and am of the opinion that the decision of the majority is incorrect and unjust. Consequently, I dissent.