# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00053-COA

**TINA FRANCO AND RODDY A. VANACOR**                    **APPELLANTS**

**v.**

**LINDA A. FERRILL AND CHARLES A.**                    **APPELLEES**
**FERRILL**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/15/2020 |
| TRIAL JUDGE: | HON. MARGARET ALFONSO |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | MALCOLM F. JONES |
| ATTORNEYS FOR APPELLEES: | JASON BROOKS PURVIS |
| | BRIAN CHRISTOPHER WHITMAN |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 06/21/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WILSON, P.J., McDONALD AND SMITH, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     Tina Franco and Roddy Vanacor appeal from the judgment of the Chancery Court of Hancock County, Mississippi, which held that Linda and Charles Ferrill had adversely possessed waterfront property on a lake owned by Franco and that the Ferrills were entitled to a prescriptive easement to use the lake. The chancery court also found that Franco and Vanacor had trespassed onto the Ferrills' property by having the land in dispute fenced and that Vanacor had trespassed by removing the decking from piers belonging to the Ferrills. The chancery court ordered Franco and Vanacor to remove the fence or pay damages of $1,800 and ordered Vanacor to pay $5,000 in damages for the removal of the pier. On

appeal, Franco and Vanacor challenge the sufficiency of the Ferrills' evidence to establish adverse possession and a prescriptive easement. They also appeal the court's findings of trespass, its awards of damages, and its dismissal of their claim against the Ferrills for trespass. Having reviewed the record and arguments of counsel, we affirm the chancery court's judgment.

**Facts and Procedural History**

¶2.    Between 1994 and 2006, the Ferrills purchased eleven lots along Kiln-Waveland Road in the Shoreline Park Subdivision in the city of Waveland, Mississippi.[1] On October 20, 1994, they purchased lots 33 and 34 from Mary Davis. The legal description on their deed described the property with the lot numbers purchased in the Shoreline Park Subdivision "as per the official map or plat thereof on file and of record in the office of the Chancery Clerk of Hancock County, Mississippi." Per the official plat, the western side of these two lots faced the road, and the eastern part of lot 33 abutted a lake known as Pine Barren's Pond.

¶3.    The Ferrills began to work on these lots, clearing trees, hauling debris, filling stump holes, leveling low spots on the property, and cutting the grass to the water's edge. They also shaped the edge of property on the lake to prevent the collapse of the shoreline. On the other side of the property, there was no access from Kiln-Waveland Cutoff Road to the property, so the Ferrills put in a culvert and made a driveway. They also graded a small street between the two lots, Victoria Street, and put down gravel so they could access the property from that direction. Victoria Street extended to the water's edge as well.

---

[1] The property was originally located in the county. After Hurricane Katrina, the property was annexed to the city of Waveland.

¶4. In 1995, the Ferrills installed a double-wide mobile home on the lots and began living there. They built two decks off their home, put in a pool, built a gazebo and fence, and landscaped the property. The Ferrills also purchased lots 1 and 2 in 1995 from Floriani Taviani and lots 31 and 32 from Lionel Bourgeois. All four of these lots bordered on the lake. The Ferrills proceeded to remove trees and brush on those lots all the way to the water.

¶5. In 1994, the Ferrills also began using the lake for fishing, kayaking, canoeing, and boating. They owned a small boat, a canoe, and a paddle boat that Mrs. Ferrill said she would use for exercise. They also constructed a floating pier/dock that they used for their lakefront activities. Mr. Ferrill placed crab pods in the lake and cast nets to catch shrimp. Mr. Ferrill testified that the general public does not use the lake, and that when he saw individuals who did not own lots on the lake fishing, he told them that they did not have permission to do so. The Ferrills' use of the lake continued over the years up to the time of the lawsuit they filed in 2019.

¶6. In September 1998, the Ferrills obtained a permit from the Mississippi Department of Marine Resources to construct a pier and deck into the lake and to dredge approximately 100 yards of material from the lake, which they used as a foundation for a building they constructed on lots 1 and 2. The Ferrills proceeded to build the pier and a pavilion near the shore, which the Ferrills later converted into an office.

¶7. On their property, the Ferrills operated a marine construction business that built boathouses, docks, piers, and similar structures. Their office and the shop where they maintained their work vehicles were located on the lots they owned as well as their

3

homestead. Mrs. Ferrill worked in the business, providing estimates for customers and obtaining permits for the work the business did. She was also a photographer, and her husband created a staging area where she could take graduation or family portraits with the lake in the background.

¶8.     In 2003, the Ferrills purchased lot 30 from Russell Van Blocklin and Bobbie Morgan. This lot, which also extended to the water, did not need as much clearing as the others, but the Ferrills maintained it throughout the years, cutting grass up to the shoreline. They also planted a garden on the lot.

¶9.     In 2006, the Ferrills bought lots 3, 4, 5, and 6 from Earl and Sharon Johnson. Because these were low lying lots that were subject to flooding, the Ferrills brought in soil and laid sod on them all the way to the water's edge. Mr. Ferrill testified that he brought in seven to eight tandem loads of fifteen yards of dirt per tandem to complete this work. He said he maintained all these lots up to the water's edge, mowing the grass as close as he could and weed-eating the rest of the way. He said he followed this maintenance schedule every week to every other week. The Ferrills also removed trash and debris from the lake following Hurricane Katrina.

¶10.    The Ferrills lost their mobile home in the hurricane, but in 2006, after living in a FEMA trailer for a year, they moved into a home they built on the property. All told, they had lived on the property and maintained their business for twenty-five years at the time of the trial. Each of the deeds to the lots that the Ferrills purchased merely described the property by lot number "per the official map or plat found in the chancery clerk's office."

¶11. The 17.83-acre lake, which the Ferrills' property bordered, was owned by Robert Bourgeois,[2] who deeded it to Louis Bourgeois on September 28, 2006.[3] Mr. Ferrill testified that since the time of their original purchase of property in 1994, no one had objected to his family's use of the lake or to his clearing and maintaining the lots to the lake's shore. Both he and his wife presumed that the property they purchased extended all the way to the lake. No one ever told them anything different, even when they built the pavilion and gazebo close to the water's edge. In fact, Lionel Bourgeois, who was Louis Bourgeois' son, often came to take pictures of the wildlife. Mrs. Ferrill testified he would come on their property, and they would discuss photography. He never said anything about their use of the lake or lakeshore. It was not until January 2019 that a dispute about this arose.

¶12. Although Louis Bourgeois owned the lake for years after obtaining the deed in 2006, he said nothing to the Ferrills about his ownership and did not object to their construction of the pier and floating pavilion or to their use and maintenance of the lake and lakeshore. Vanacor testified that Louis Bourgeois had actual knowledge of the Ferrills' use of the land and lake in question. Mr. Ferrill admitted that he did not pay taxes on the lake, and he assumed that if anyone did, it would be taxes for the small island in the middle of the lake that was only used by wildlife for nesting. Mr. Ferrill did not know of anyone owning the shoreline around the lake because he assumed his property went to the water's edge. The

---

[2] Tax receipts show that Robert Bourgeois may have purchased the lake parcel at a tax sale in 2006, and the parcel was not redeemed. However, there was no evidence that he filed suit to confirm his title. Thereafter, he did pay taxes on the parcel.

[3] There is no evidence in the record concerning the development of this subdivision or the construction of the lake.

official plat maps from 1966 do not show any strip of land around the lake; they just show the lots up to and adjoining the lake.

¶13. In October 2017, Bernie and Alexandria Thames conveyed lots 27 and 28 to Vanacor. Vanacor, a commercial fisherman who lived in Louisiana, was aware of the lake after visiting it after Hurricane Katrina. He testified that he worked with Kevin Bourgeois, the son of the lake's owner, Louis Bourgeois. Kevin told Vanacor that if he was interested in buying it, he should talk to his father. Vanacor did so, and Louis Bourgeois quitclaimed the lake to Vanacor on October 30, 2017. Vanacor's deed describes the lake property as "Shoreline Park, Unit #7 (Lake), Section 28, Township 3 South, Range 14 West, Mississippi as per the official plat thereon on file and of record in the office of the Chancery Clerk of Hancock County Mississippi, reference to which is hereby made in aid of and as a part of this description."

¶14. Vanacor then had a survey of the lake done on December 17, 2018. According to this private survey, Vanacor owned not just the lake, but also twelve to fifteen feet along its edge and the land where Victoria Street was located. Vanacor also paid to have the lake stocked with bass and bream. However, Mr. Ferrill testified that prior to that, he and other neighbors had fished the lake with great success. Mr. Ferrill said he knew of no one stocking the lake between 1994 and 2018.[4]

¶15. On November 28, 2018, Vanacor deeded his two lots and the lake to Tina Franco. Franco, who had lived in Florida, had met Vanacor in the Bahamas twelve years prior. She

---

[4] Vanacor testified that he was making no request for damages from the Ferrills for fishing in the lake.

6

visited the area with Vanacor in 2017 and relocated to Diamondhead, Mississippi, where she worked as a barber. Although she did not live on the lots deeded to her, she said she planned to build on them.

¶16. Even though Vanacor had deeded the property to Franco in 2018, on January 22, 2019, Vanacor applied to the city of Waveland for a permit to erect a fence, asserting that he owned the lakefront property. The permit was granted that same day, and Scott Fence Company proceeded to erect a chain-link fence along the lake, cutting off access to it from any of the Ferrills' lots.[5] Later, Franco and Vanacor both signed a second fence-permit application dated July 23, 2019. Pursuant to it, they fenced off a part of Victoria Street, which included a portion of the area that the Ferrills had previously developed as a driveway into their property.

¶17. Thereafter, in July 2019, Vanacor dismantled the pier that the Ferrills had built and maintained, even though Franco, and not Vanacor, owned the lake. Vanacor said he did this because the prior owner of the lake, Louis Bourgeois, told him he could. Vanacor also said that the pier was in a state of disrepair and not walkable. Vanacor further testified that Franco did not tell him to tear down the pier; he did so unilaterally. The Ferrills disagreed with Vanacor's description of the condition of the pier, and photographs of the fencing work showed the pier was in good condition. Mrs. Ferrill, who routinely provided estimates for their business's customers for pier construction, estimated that it would cost $5,000 to repair the pier that Vanacor had destroyed. She also estimated that it would cost $1,800 to $2,000

---

[5] It appears that Vanacor erected a cyclone fence on the shoreline of the lake that abutted the Ferrills' property. In other places, Vanacor just installed posts.

7

to remove the fence from their property.

### A. Court Filings

¶18. After the first fencing work began, on March 29, 2019, the Ferrills filed suit against Franco in the Hancock County Chancery Court for civil trespass on the waterfront property the Ferrills claimed they owned by adverse possession, for confirmation of their title by adverse possession, for nuisance, and for a prescriptive easement over the lake. In an amended complaint filed on March 31, 2020, the Ferrills added Vanacor as a defendant. Franco and Vanacor answered and counterclaimed against the Ferrills for trespass, violation of a Hancock County zoning ordinance, and private and/or public nuisance for pollution of the lake.

¶19. On August 28, 2019, the Ferrills filed a motion for a preliminary injunction, raising among other things the destruction of the Ferrills' pier and erection of the fence. After hearing arguments on the motion for a preliminary injunction, the chancery court issued an order on November 15, 2019, ordering the parties not to alter or modify the property while the case was pending or make any complaint against each other to any state or federal agency.

### B. Trial

¶20. The chancery court conducted a two-day trial on September 21- 22, 2020. Franco and Vanacor's attorney had been allowed to withdraw as counsel prior to trial, and the two elected to proceed pro se. At trial, both Mr. and Mrs. Ferrill testified to the facts above, as did Vanacor and Franco. Additionally, Vanacor testified that he had continued to fence

around the lake even into 2020. He did not consider this to be in violation of the temporary injunction that the court had issued. Although he claimed he was not aware of the order, Vanacor also called the Mississippi Department of Environmental Quality (MDEQ) twice to complain about oil on the pond and implicated the Ferrills property. One complaint was made on the same day that the injunction was entered. The MDEQ found no evidence to support the complaint.

¶21. To support her claim of trespass, Franco testified that the Ferrills had gone into the office building they had constructed near the water, which Franco claimed was built partially "on her property." She also said that she had seen Mr. Ferrill on the property between the fence and the shore, but she could not give a date or say what he was doing. She said that after a big storm, the floating pier had become loose, and later it was tied up again, so someone had to have done it, and she assumed it was Mr. Ferrill. She admitted that she suffered no damages from the Ferrills prior to the filing of the lawsuit.

¶22. Vanacor and Franco also called David Draz, the city of Waveland's business manager and zoning official. He verified a letter he had sent to Vanacor on December 18, 2018, in which he referenced the Hancock County Tax Assessor's "Geoportal" property maps that included Victoria Street as part of Vanacor's lake property. Draz testified that the geoportal map also has shown other streets as being parts of other parcels and that there is a process whereby the parcel owner can have the city vacate the street, and ownership will revert back to the parcel owner. However, according to Michael Jones, Waveland's city attorney, Victoria Street was never vacated in this manner. Draz also testified that the geoportal map

9

is not more accurate than the official plat map filed in the chancery clerk's office and that a survey is required before a fence permit is issued. Moreover, the geoportal map has since been changed and is now consistent with the official plat map and shows no shoreline strip of property.

¶23. Duke Levy, an engineer and surveyor, testified about the survey of the lake property that he prepared for Franco and Vanacor on December 17, 2018. He said he used prior deed descriptions and the original geoportal map to prepare the survey. He did admit that the official plat in the chancery clerk's office has Victoria Street extending down to the water's edge and that his survey differs from this. He explained that this was because he considered the tax parcel number and the tax assessor's geoportal map to prepare his survey, not the official plat. He also said that he recognized that the official plat refers to Victoria Street as a street, but he had no problem including it in the lake parcel because it was the only access of ingress and egress to the property. Levy also testified that he surveys property by what the landowner says he owns:

> THE COURT: It's cross-examination. But hold on. If I tell you, sir, that I own from the corner of that building to the corner of that building to the corner of that building to the corner, that's what you are going to survey?
>
> THE WITNESS: Yeah, I do it by what he tells me he owns, and what he wants surveyed.

¶24. Three other witnesses testified at trial. Geoffrey Clemens of Compton Engineering, who is also county engineer for Hancock County, testified that in 2003, Victoria Street was designated as a county road on the county road map. It terminated somewhere in the vicinity of the lake. Richard Boyanton of Scott Fence Company testified that when he started putting

up the fence, Mr. Ferrill tried to stop him, claiming that Boyanton was on his property. The situation became hostile, and at one point, Mr. Ferrill backed up his trucks to prevent the fencing. Boyanton fenced around the trucks and called law enforcement. They threatened to tow Mr. Ferrill's trucks, and two days later, he moved them. Boyanton then reworked that portion of the fence. Boyanton noted that the waterfront edges had been maintained and that the Ferrills' pavilion/office encroached four to six feet onto the property around the lake where the fence was built. So the fence there was built around the building. Vic Johnson, a road manager for Hancock County, testified that a portion of Victoria Street was actually a county road before Waveland annexed it.

¶25. At the end of the trial, the Ferrills renewed their motion for contempt for Vanacor's violation of the November 19, 2018 temporary injunction. The Ferrills also moved to dismiss Franco and Vanacor's counterclaims of trespass since both testified that they incurred no damages as a result of the Ferrills' actions, and thus, Franco and Vanacor's trespass action failed.

¶26. On December 15, 2020, the chancery court entered a judgment finding in favor of the Ferrills on their claims of adverse possession of the waterfront strip of land adjoining their lots. The chancery court also granted the Ferrills a non-possessory right to use the waters of the lake pursuant to a prescriptive easement. The chancery court further found that Franco and Vanacor had trespassed on the Ferrills' property and that the Ferrills were entitled to damages of $1,800 from Franco and Vanacor if they failed to remove the fence around the lake within sixty days. The chancery court also ordered Vanacor to pay the Ferrills $5,000

11

within sixty days for Vanacor's removal of the decking to the pier that the Ferrills had constructed. The chancery court dismissed Franco and Vanacor's counterclaims for trespass and nuisance. The chancery court also ordered the Ferrills to obtain a legal description to the property they had acquired by adverse possession within 120 days "so the court may supplement [its] ruling with a proper legal description."

¶27. On January 12, 2021, Franco and Vanacor appealed and now present the following issues:

I. Whether the chancery court erred in finding that the Ferrills had presented clear and convincing evidence that they had adversely possessed the waterfront property.

II. Whether the chancery court erred in finding that the Ferrills had presented clear and convincing evidence that they were entitled to a prescriptive easement for use of the lake.

III. Whether the chancery court erred in finding that the Ferrills were entitled to ownership and a prescriptive easement when they failed to provide a correct legal description of the property at trial or post-judgment as directed by the chancery court.

IV. Whether the chancery court erred in ordering Franco to remove or pay for the removal of the fence when it was undisputed that she was not responsible for its removal.

V. Whether the chancery court erred in ordering Franco and Vanacor to pay for the fence removal when they acted in good faith, and the Ferrills failed to offer any evidence of the cost of removal.

VI. Whether the chancery court erred in ordering Vanacor to pay expenses for the removal of the Ferrills' pier when the Ferrills failed to offer any evidence of the reasonable cost to replace same.

VII. Whether the chancery court erred in dismissing Franco's claim of trespass.

12

**Standard of Review**

¶28. "This Court has a limited standard of review in examining and considering the decisions of a chancellor." *Frazier v. Frazier*, 31 So. 3d 1218, 1219-20 (¶4) (Miss. Ct. App. 2009) (quoting *Ellison v. Meek*, 820 So. 2d 730, 734 (¶11) (Miss. Ct. App. 2002)). "A finding that the proof was sufficient to sustain a claim of adverse possession is a fact-finding that requires our application of the substantial-evidence/manifest-error test." *Presley v. Stokes*, 290 So. 3d 763, 765 (¶6) (Miss. Ct. App. 2020); *Powell v. Meyer*, 203 So. 3d 648, 652 (¶16) (Miss. Ct. App. 2016). "When reviewing a chancellor's decision, we will accept a chancellor's findings of fact as long as the evidence in the record reasonably supports those findings. In other words, we will not disturb the findings of a chancellor unless those findings are clearly erroneous or an erroneous legal standard was applied." *Frazier*, 31 So. 3d at 1220 (¶4).

**Discussion**

I.    **Whether the chancery court erred in finding that the Ferrills had presented clear and convincing evidence of adverse possession of the waterfront property.**

¶29. Under Mississippi Code Annotated section 15-1-13(1) (Rev. 2019),[6] a party may

---

[6] Section 15-1-13(1) provides:

Ten (10) years' actual adverse possession by any person claiming to be the owner for that time of any land, uninterruptedly continued for ten (10) years by occupancy, descent, conveyance, or otherwise, in whatever way such occupancy may have commenced or continued, shall vest in every actual occupant or possessor of such land a full and complete title, saving to persons under the disability of minority or unsoundness of mind the right to sue within ten (10) years after the removal of such disability, as provided in Section 15-1-7. However, the saving in favor of persons under disability of

13

claim title to property after ten years' actual adverse possession. To establish a claim of adverse possession, a party must show that his possession was "(1) under claim of ownership; (2) actual or hostile; (3) open, notorious, and visible; (4) continuous and uninterrupted for a period of ten years; (5) exclusive; and (6) peaceful." *Frazier*, 31 So. 3d at 1220 (¶6) (quoting *West v. Brewer*, 579 So. 2d 1261, 1262 (Miss. 1991). The burden is on the one claiming title by adverse possession to prove each element by clear and convincing evidence. *Orcutt v. Chambliss*, 243 So. 3d 757, 762 (¶15) (Miss. Ct. App. 2018). Proof of the elements of adverse possession can overlap. *Edwards v. Williams*, 292 So. 3d 586, 593 n.4 (Miss. Ct. App. 2019).

### A. Claim of Ownership

¶30. "When determining whether an adverse possessor has staked a proper claim of ownership, the relevant inquiry is whether the possessory acts relied upon by the would[-]be adverse possessor are sufficient to fly his flag over the lands and to put the record title holder on notice that the lands are held under an adverse claim of ownership." *O'Neal v. Blalock*, 220 So. 3d 234, 240 (¶14) (Miss. Ct. App. 2017). We reiterated this holding in *Revette v. Ferguson*, 271 So. 3d 702, 708 (¶12) (Miss. Ct. App. 2018). In that case, we found that Ferguson had provided sufficient notice to Revette's predecessors in interest based on Ferguson's testimony that he believed that the disputed parcel was part of the property when he purchased it. *Id*. at (¶13). He and his family had treated the property as their own, running cattle, riding horses, hunting, fishing, camping, and planting grass on it. *Id*. They

---

unsoundness of mind shall never extend longer than thirty-one (31) years.

14

even gave others permission to hunt on the disputed parcel. *Id*. We found this activity provided sufficient notice to the prior owners of Revette's property of Ferguson's claim of ownership. *Id*.

¶31.    In this case, the deeds to each of the Ferrills' properties described their lots located in the Shoreline Park Subdivision "as per the official map or plat thereof on file and of record in the office of the Chancery Clerk of Hancock County, Mississippi." The chancery clerk's official plat shows each lot abutting the lake. Thus, Mr. Ferrill testified that he always thought his property went to the water's edge. He maintained the disputed strip over the years, cutting the grass on it and weed-eating it to the water's edge. He imported dirt to reinforce the shore from washing away. The Ferrills also constructed a pavilion on the disputed property that later became their office. There was sufficient evidence of the Ferrills' possessory acts to put any owner of the disputed property on notice of their claim and sufficient evidence to support the chancellor's finding that they satisfied this element by clear and convincing evidence.

### B.    Actual or Hostile

¶32.    "The actual or hostile occupation of land necessary to constitute adverse possession requires a corporeal occupation, accompanied by a manifest intention to hold and continue to hold the property against the claim of all other persons, and adverse to the rights of the true owner." *Cronier v. ALR Partners L.P.*, 248 So. 3d 861, 868-69 (¶22) (Miss. Ct. App. 2017) (internal quotation marks omitted). For example, farming land for twenty years, granting hunting leases, and flagging the property line are hostile uses. *Anderson v. Fisher*, 296 So.

15

3d 124, 130-31 (¶17) (Miss. Ct. App. 2019); *see also Revette*, 271 So. 3d at 708 (¶13) (finding testimony sufficient to establish hostile use was shown by the adverse possessor who believed his purchase of his land included the disputed parcel; his family ran cattle, rode horses, hunted, fished, camped, and planted grass on the disputed property; and they leased the parcel to a hunting club that put up deer stands and posted "no trespassing" signs that were visible from 300 to 400 feet).

¶33.     Ultimately, the question is whether the possessory acts of the claimant are sufficient to put the record title holder on notice that the property is held under an adverse claim of ownership. *Orcutt*, 243 So. 3d at 762 (¶15); *Hill v. Johnson*, 27 So. 3d 426, 431 (¶23) (Miss. Ct. App. 2009). Moreover, in *Cronier*, we held that the adverse possessor must prove that other owners were "aware of their occupation and took no action to prevent it." *Cronier*, 243 So. 3d at 869 (¶25) (citing *Double J Farmlands Inc. v. Paradise Baptist Church*, 999 So. 2d 826, 829 (¶15) (Miss. 2008)). "The polestar question is whether the possessory acts by the adverse possessor sufficiently put the record title holder on notice that the property is held under an adverse ownership claim." *McLendon v. Copiah Forest Prod. Inc.*, 926 So. 2d 260, 263 (¶4) (Miss. Ct. App. 2006).

¶34.     In this case, Franco and Vanacor do not dispute the substantial acts of possession that the Ferrills undertook on the lots they owned. From 1994 through the time of the trial in 2020, they lived on the land, developed and operated their marine construction business on the property, built out-buildings, a home, an office, and other structures on it. In addition, since 1994, they maintained all the lots down to the water's edge until Franco fenced it in

16

2019. They built a pier and floating deck into the lake, all in plain sight and without objection of the lake's prior owners, Robert and Louis Bourgeois.

¶35. Despite this proof, Franco and Vanacor argue that there was no **actual notice** to the Bourgeois owners and that the Ferrills' possessory acts were minimal. They cite several cases where an adverse possessor's actions were found insufficient to constitute notice of an adverse claim. However, the possessory acts in those cases were minimal in comparison to the Ferrills' acts. In *Stewart v. Graber*, 760 So. 2d 868, 869 (¶¶8-9) (Miss. Ct. App. 2000), the Stewarts merely used land occasionally to pasture cattle without an enclosure and at times gardened. In *Walker v. Murphree*, 722 So. 2d 1277 (Miss. 1998), looking at the quality rather than the quantity of the possessory acts, the supreme court held, among other things, that Walker's claim of adverse possession failed because he could not provide any details regarding the size of the alleged garden he claimed to have maintained, he never claimed ownership until suit was brought, and he did not counterclaim for title. *Id*. at 1282 (¶19). In *Rawles v. Parker*, 602 So. 2d 1164, 1168 (Miss. 1992), Parker argued that he had stored "junk" along the disputed fence line and had a garden there as well. The supreme court rejected this testimony, noting that it was common in rural areas to dump trash on other people's property and call it "storage" and that there was testimony that the garden was in another spot altogether. *Id.* The minimal acts in these cases that Franco and Vanacor cite cannot compare to the continuous and substantial acts that the Ferrills undertook on their property, all of which extended to the lake in question. Franco and Vanacor want to limit the court's examination to only the mowing and placement of sod to "shore up" the property's

17

edge. However, the proof showed that the Ferrills used the waterfront to construct a pier and dock that they, their family, and their friends used, as shown by photographs of picnics that were entered into evidence. They built a pavilion that even Franco and Vanacor admit is on this property. The record clearly shows that the Ferrills' use was substantial and supports the chancery court's finding that such use was actual and hostile.

### C. Open, Notorious, and Visible

¶36. "In addition to the requirements that possession be under a claim of ownership and hostile, possession must also be open, notorious, and visible." *Revette*, 271 So. 3d at 709 (¶19). For example, in *Collins v. Moore Family Trust 1999*, 269 So. 3d 184, 190-91 (¶24) (Miss. Ct. App. 2018), we affirmed a judgment by a chancellor who found that an adverse possessor's unrestrictive use of land from 1911 to 2016, which included farming, bushhogging, raising cattle on the parcel, and maintaining both the fence and the fenced-in parcel, was open, notorious, and visible even though the use was not daily.

¶37. In this case, the Ferrills lived on the land, operated their business on the property, and used the lake and lakeshore openly for all to see. They maintained it and developed the shoreline by shoring up the lake's edge at different places and dredging it in others. They constructed a pier and dock off the water's edge and a pavilion on the disputed property long before Franco and Vanacor had any interest. These actions are clearly sufficient to establish by clear and convincing evidence the open, notorious, and visible element of adverse possession.

### D. Continuous and Uninterrupted for a Period of Ten Years

18

¶38.    Intermittent use is insufficient to establish a continuous presence on land. *Presley v. Stokes*, 290 So. 3d 763, 765 (¶15) (Miss. Ct. App. 2020) (discussing intermittent cutting of hay once or twice a year and some grazing by cattle).  In this case, there is no dispute that the Ferrills' use was continuous and uninterrupted.  They purchased their last lot in 2006 and used their property to the water's edge until they were fenced out in 2019, establishing the ten-year-prescriptive period required.

### E.    Exclusive

¶39.    We have defined exclusive possession as "effective control over a definite area of land, evidenced by things visible to the eye or perceptible to the senses. It includes control over the land and the intent to exclude others except with the occupant's consent." *Winters v. Billings*, 281 So. 3d 75, 81 (¶17) (Miss. Ct. App. 2019).  "Exclusive possession is an intention to possess and hold land to the exclusion of, and in opposition to, the claims of all others, and the claimant's conduct must afford an unequivocal indication that he is exercising dominion of a sole owner." *Id*. at 82 (¶21) (internal quotation marks omitted).

¶40.    We need not recite again the litany of possessive acts by the Ferrills that also establish their exclusive use of the shoreline on their individual lots.  The record was sufficient to support the chancery court's finding that the Ferrills had proved exclusive use during the relevant period of time.

### F.    Peaceful

¶41.    "An adverse possessor's use of a claimed property must be peaceful." *Collins*, 269 So. 3d at 191 (¶29).  When the record reflects no dispute over the subject property, there is

sufficient evidence to support the chancellor's determination that possession was peaceful. *Id*. In this case, there was no testimony in the record of any dispute over the subject property during the relevant period of claimed adverse possession from 1994 through 2019. When a dispute arose after Vanacor purchased his lots and the lake, the Ferrills filed suit to quiet their title. We find sufficient evidence to support a finding of peaceful use until that time.

¶42. In summary, after examining the proof presented to the chancery court, we find that the chancery court's finding that the Ferrills had established ownership of the waterfront by adverse possession was sufficiently supported by the record.

**II.    Whether the chancery court erred in finding that the Ferrills had presented clear and convincing evidence that they were entitled to a prescriptive easement over the lake.**

¶43. Franco and Vanacor next challenge the chancery court's finding that the Ferrills had proved their claim of a prescriptive easement to use of the lake. "The standard and burden of proof to establish a prescriptive easement is the same as a claim of adverse possession of land." *Thornton v. Purvis*, 305 So. 3d 1173, 1178 (¶21) (Miss. Ct. App. 2020); *Mayton v. Oliver*, 247 So. 3d 312, 322 (¶32) (Miss. Ct. App. 2017). "To establish a prescriptive easement, the claimant must show that its 'use' of the property was (1) open, notorious, and visible; (2) hostile; (3) under claim of ownership; (4) exclusive; (5) peaceful; and (6) continuous and uninterrupted for ten years." *London & Stetelman Inc. v. Tackett*, 308 So. 3d 445, 451 (¶17) (Miss. Ct. App. 2020) (citing *Paw Paw Island Land Co. v. Issaquena & Warren Cntys. Land Co.*, 51 So. 3d 916, 923-24 (¶27) (Miss. 2010)).

¶44. Most Mississippi cases that have examined the elements of prescriptive easements

involved easements claimed over land. *See Watts v. Jackson*, 281 So. 3d 203, 208 (¶15) (Miss. Ct. App. 2019) (finding landowner's use of private road owned by neighbor was not hostile or exclusive); *Threlkeld v. Sisk*, 992 So. 2d 1232, 1240 (¶26) (Miss. Ct. App. 2008) (finding landowner proved the elements of a prescriptive easement over a gravel road to access their landlocked farmland); *Rawls v. Blakeney*, 831 So. 2d 1205, 1210 (¶18) (Miss. Ct. App. 2002) (finding prescriptive easement established over a road partially cutting across adjoining property owner's land). There is a Mississippi case dealing with the use of a private lake, but it involved a dispute between the owners of the property beneath the lake and concerned the extent of their right to use the lake water above.[7] In another Mississippi case, the supreme court dealt with a dispute between a lake-bed owner and an adjoining landowner who claimed an ownership right to use the lake; but it too did not deal with a claim to a prescriptive easement.[8] Neither of these cases are applicable to the case at hand.

---

[7] *Black v. Williams*, 417 So. 2d 911 (Miss. 1982), cited by Franco and Vanacor, dealt with a dispute between the two owners of the lake-bed property over the extent of their ownership rights. In that case, after obtaining easements from landowners, a public drainage district erected a flood-prevention dam which formed a lake. *Id*. Two landowners whose property was flooded (one owning 110.9 acres of the lake bed and the other 14.4 acres) argued over the right to use each other's portions of the lake water above. *Id*. When the lake was created, boundaries between the two parcels in the lake bed were marked with posts extending to the surface. *Id*. The supreme court held that Black did not have the right to go beyond the boundaries of his land in the lake. *Id*. at 912. However, the supreme court limited the applicability of the case, saying, "we address only the rights of owners of land beneath 'artificial' or 'man-made lakes.'" *Id*. *Black* did not address any claim of a prescriptive easement to use a lake.

[8] In *Crenshaw v. Graybeal*, 597 So. 2d 650 (Miss. 1992), owners of land adjoining a man-made lake sued to establish their right to recreational use of the lake because they claimed a right to the lake-bed property itself. *Id*. at 651 In that case, Graybeal purchased property that abutted a private, man-made lake in 1960. *Id*. The lake was created in the 1940s by the Crenshaw family who allowed Graybeal and the prior owner to use the lake.

¶45.     We agree with Franco and Vanacor that because there is no Mississippi case on point concerning a prescriptive easement for use of a privately owned lake, cases from other jurisdictions may be helpful to consider.  They cite *Carnahan v. Moriah Property Owners Association*, 716 N.E.2d 437 (Ind. 1999), as one.  However, in that case, Carnahan had a right to use the lake because his deed included ownership of a portion of the lake bed.  *Id*. at 439.  He desired full use of the lake and claimed a prescriptive easement.  *Id*.  The Indiana Supreme Court cited Indiana law for the elements needed to establish a prescriptive easement (actual, hostile, open, notorious, continuous, uninterrupted adverse use for twenty years).  *Id*. at 441.  For those claiming an easement over a path or a road, twenty years of use created a rebuttable presumption that the use was adverse.  *Id*. at 442.  The court rejected any presumption in favor of a party trying to claim a prescriptive easement for the recreational use of a body of water because of the "very different character from use of a path or road for ingress and egress over land."  *Id*.  The court required special proof of activities that were in fact adverse, and not permissive.  *Id*.  It concluded that the facts presented of the Carnahans'

---

*Id*.  In the 1980s, the Crenshaws developed a subdivision and deeded lots to others that included privileges and ownership rights to the lake within the boundary of their property.  *Id*. at 652.  The Graybeal's deed did not have such language.  *Id*. at 651.  After a falling out with the Crenshaws, who then restricted Graybeal's use of the lake, Graybeal sued and claimed a right to recreational use of the lake.  *Id*. at 652.  The chancery court ruled that the Graybeals could use the lake in the immediate area of their frontage on the lake, but the Mississippi Supreme Court reversed, because Graybeal had no basis to establish any rights to the lake or lake-bed property.  *Id*.  The *Crenshaw* holding, however, is inapplicable to this case because the Ferrills are making no claim to own the lake-bed property; they are claiming a prescriptive easement to its use.  The *Crenshaw* court specifically stated, "[B]elatedly, the Graybeals claim easement by prescription and easement by implication. Neither of these issues was raised or litigated below."  *Id*. at 653.  Thus, *Crenshaw* made no ruling on whether the proof had established a prescriptive easement, and it is inapplicable to this case.

22

recreational activities, which were sporadic and apparently permissive rather than confrontational, did not constitute the required adverse use. *Id.* at 443-44.

¶46. However, cases from other jurisdictions have not imposed a higher burden of proof to establish a prescriptive easement for use of a private lake. Rhode Island is one. In *Reitsma v. Pascoag Reservoir & Dam LLC*, 774 A.2d 826, 830 (R.I. 2001), a private lake, known as Echo Lake, covering 387 acres of water and ten miles of shoreline, was created in 1860 by mill workers who used the lake to power their mills. *Id.* In 1964, the state purchased a lot abutting the lake and constructed a boat ramp that the state allowed the public to use to launch boats. *Id.* Pascoag Reservoir & Dam LLC ("Pascoag") purchased the lake in 1983. *Id.* Fourteen years later, in 1997, Pascoag erected "no trespassing" signs and would not allow the public to access the lake. *Id.* The state filed suit against the private owner of the artificially created lake, alleging that it and the public had a prescriptive easement to use the boat ramp and access the lake for recreational purposes. *Id.* at 826. The lake owner counterclaimed for trespass. *Id.* The trial court held that no prescriptive easement was established because the use of the lake had not been adverse, but permissive. *Id.* at 829. However, the Rhode Island Supreme Court disagreed, finding that the there was no evidentiary support for the trial court's finding that the use of the lake had been done with the permission of the lake bed owners. *Id.* at 832. The court noted the elements for easement by prescription, which were similar to those required by our courts in Mississippi, namely actual, open, notorious, hostile, and continuous use under a claim of right for ten years. *Id.* at 831. The Rhode Island Supreme Court held:

23

> The court erred by failing to find that the very act of openly placing a permanent physical structure on another's property without the true owner's permission and maintaining it there for more than ten years is itself an action that is so inconsistent with the true ownership of that property that it is therefore notorious, adverse, hostile, and under claim of right as a matter of law.

*Id*. at 834-35. The court explained that "adverseness and hostility [can be] inferred from the mere *use* of property without [the] owner's communicated permission to do so." *Id*. at 835. The court reviewed the testimony of several witnesses concerning continuous use of the lake for more than the required time period without ever seeking permission to use the lake. *Id*.

¶47.     Similarly, in Pennsylvania, an owner of property on the shore of a privately owned lake successfully sued and established a prescriptive easement for the use of the lake. *Shaffer v. Baylor's Lake Assoc.*, 141 A.2d 583 (Pa. 1958). In that case, Shaffer owned an interest in land that had been in her family since 1903. *Id*. at 584. The land extended along a lake for approximately 650 feet. *Id*. From 1903 on, the family fished there year round, watered cattle there from 1903 to 1947, built a stone dock into the lake in 1922 and extended it after 1926. *Id*. To a limited extent, they even rented boats to the public for use on the lake. *Id*. In 1953, Baylor's Lake Association Inc. ("BLA") purchased the lake from its predecessor who had acquired it in 1944. *Id*. at 585. BLA challenged Shafer's continued right to use the lake. *Id*. A jury found for Shafer and BLA appealed. *Id*. at 584. Under Pennsylvania law, an easement by prescription could be established by adverse, open, notorious, continuous, and uninterrupted use for twenty-one years. *Id*. Citing its own precedent in *Miller v. Lutheran Conference & Camp Assoc.*, 200 A. 646 (Pa. 1938), the Pennsylvania Supreme Court held:

> Applying the rule of reason to the facts in the instant case, we find that plaintiff has established (1) a prescriptive right and is entitled to swim and to boat and to fish within a reasonable distance of her land; (2) a prescriptive right to her present dock, and (3) a prescriptive right to water her cattle in front of her land. These rights do not include the right to use any part of the lake for commercial boating or other commercial purposes, since prior use for such purposes, even tho[u]gh adverse, was merely casual and sporadic.

*Schaffer*, 141 A.2d at 587.

¶48.    A reported case of a trial court in New York found that an owner of property adjoining a privately owned lake who was cut off from access when the lake-bed owner installed log cribbing and filling it with dirt, gravel, sand, and other material, had established a prescriptive easement to use of the lake. *Carlino v. Barton*, 349 N.Y.S.2d 535, 542 (N.Y. Sup. Ct. 1973). In that case, Barton had conveyed a lot to Carlino and the legal description said that it ran to "the shores of Brant Lake[.]" *Id*. at 538. The Supreme Court for Warren County, New York (the trial court), held that a description carrying a boundary "by the shore" or "to the shore" was a clear restriction and did not convey title to the center of the water. *Id*. at 539. But the trial court further found that Carlino's lot extended to include the space between the low-water and high-water marks of the lake. *Id*. The trial court also found that, even if the space between the low- and high-water marks was not included in the lot's legal description, the proof still showed that Carlino had adversely possessed it for the fifteen years required under New York law. *Id*. at 540-41. Finally, the New York trial court found that Carlino had established the right to enter and use the lake for recreational purposes by prescription. *Id*. at 542.

> The proof, unrebutted, establishes that plaintiffs and members of their families used and occupied the adjoining waters of the lake for the aforesaid purposes

25

continuously from the time they acquired the premises, and for the required statutory period of fifteen years or more. They certainly did so under claim of right, whether mistaken or not, because it is obvious from their testimony and from the character, location and suitability of the lot itself, in relation to the water, that the value to them and their prime purpose in acquiring it was to be able to enter and enjoy the water for the recreational purposes aforesaid.

*Id.*

¶49. We find these cases to be more applicable to the case at hand because the laws applied are consistent with our courts' prescriptive-easement precedent. We decline to redefine or heighten the requirements for showing adverse use when the prescriptive easement is for recreational use of water, as did the Indiana Supreme Court in *Carnahan*. The courts from Rhode Island, Pennsylvania, and New York applied the general principles of law that Mississippi has established to prove prescriptive easements on land.

¶50. In light of both Mississippi precedent for the establishment of easements over land, as well as the cases from other jurisdictions that have dealt with easements for the recreational use of water, we examine the chancery court's findings on the elements that the Ferrills were required to prove, by clear and convincing evidence, to establish a prescriptive easement of use of Franco's lake.[9]

---

[9] The separate opinion does not join in this analysis but would simply apply the elements that our courts have required to establish a prescriptive easement on land to deciding whether a prescriptive easement of use of a lake had been created. After reciting the elements, the separate opinion states, "There is nothing in this test that applies exclusively to land, and the test can be applied to the lake in this case as well." However, the opinion does not cite a case to support that statement. Given that there is no Mississippi case deciding this particular kind of easement, and given that the recreational use of a body of water is different from use of land, we feel the better approach is to examine how other jurisdictions have handled the issue and make a decision that is consistent with our body of law.

26

### A. Open, Notorious, and Visible

¶51. Although a party claiming an easement by prescription is not required to prove their use was constant, day and night, they must provide proof "to establish that the servient landowner knew of and acquiesced in the adverse use or that the adverse use was 'so open, notorious, visible, and uninterrupted that knowledge and acquiescence will be presumed.'" *Thornton v. Purvis*, 305 So. 3d 1173, 1180 (¶30) (Miss. Ct. App. 2020) (quoting *Myers v. Blair*, 611 So. 2d 969, 971 (Miss. 1992)). In that case, Thornton had failed to prove this element in his claim for a prescriptive easement to use a gravel road on Purvis's property. *Id*. at (¶31). We found no error by the chancellor who found that Thornton's use of the road was limited to a few days per year, which was insufficient notice to other landowners. *Id.*

¶52. In this case, the testimony and evidence showed that the Ferrills used the lake for various recreational uses since they began purchasing lots around it in 1994. Like *Shaffer*, the Ferrills constructed a pier into the lake, taking land from the lake-bed bottom to do so, with no permission from the lake owner but no objection either. Their use was visible to all, including the prior owners of the lake who visited the property. Even Vanacor testified that these prior owners knew of the Ferrills' use and did nothing to stop it. Accordingly, the record supports the chancery court's finding that the Ferrills' use of the lake was open, notorious, and visible.

### B. Hostile

¶53. "Hostile use is use that is inconsistent with the title of the servient-estate owner." *Threlkeld*, 992 So. 2d at 1239 (¶18) (citing *Moran v. Sims*, 873 So. 2d 1067, 1069 (¶8) (Miss.

Ct. App. 2004). In *Threlkeld*, the party opposing the prescriptive easement argued that a previous owner had given permission to use a road years before. *Id*. at (¶20). We found that the actual statement that the road was public could not be characterized as giving consent or permission to use it. *Id.* Thus we found the prescriptive-easement claimant's use was hostile. *Id.* In this case, the proof showed that the Ferrills never obtained the expressed permission of the prior owners of the lake, yet openly used it nonetheless. Moreover, the Ferrills' construction of a permanent pier into the lake to facilitate their use would similarly be considered hostile. The record clearly supports the chancery court's finding on this element.

### C. Under the Claim of Ownership

¶54. In a prescriptive-easement case, a party need not claim to *own the land* (in this case, land under the lake); they only need to claim to *own an easement* to use it. *Watts*, 281 So. 3d. at 207 (¶11). A claimant's use and maintenance of the property is evidence of a claim to an easement over it. *Threlkeld*, 992 So. 2d at 1239 (¶21) (finding use of gravel road along with proof of grading it and filling holes would support a finding that the use was under a claim of ownership). In this case, the Ferrills testified that they believed their property extended to the water and included the use of the lake as well. They used it for fishing, boating, and swimming, and they cleaned the lake after Hurricane Katrina. They built a pier into the lake itself to give them even more access and opportunities to use the lake. The chancery court's finding that the Ferrills had a claim of ownership of an easement is supported by the record.

28

### D.    *Exclusive*

¶55.    Exclusive use is not use to the exclusion of others; it is only use that is "consistent with an exclusive claim to the right to use." *Moran v. Sims*, 873 So. 2d 1067, 1069 (¶10) (Miss. Ct. App. 2004).  In *Moran*, which concerned a prescriptive easement to a driveway, the evidence showed that only the Sims family and those whom they implicitly permitted used the driveway.  *Id.*  We found that this proof was sufficient to show exclusive use.  *Id.* Similarly, in *Threlkeld*, that a gravel road was used only by the prescriptive-easement claimant and his guests showed use consistent with an exclusive right to use it.  *Threlkeld*, 992 So. 2d at 1239-40 (¶22).  In this case, the Ferrills testified that they believed only they and other owners of lots bordering the lake could use it, and that they have told other interlopers to leave.  Moreover, as the chancery court pointed out, there was no public access to the lake.  Therefore, the evidence in the record here supports the chancery court's finding that the Ferrills' use was exclusive.

### E.    *Peaceful*

¶56.    "'Peaceful' is defined as marked by, conducive to, or enjoying peace, quiet, or calm." *Watts*, 281 So. 3d at 207 (¶13) (internal quotation marks omitted).  Peaceful use is use without objection by the record owner.  In *Threlkeld*, the record owner made no objection to the claimant's use of a gravel road from 1965 to the mid-nineties.  *Threlkeld*, 992 So. 2d at 1240 (¶22).  We found this "substantially" supported a finding of peaceful use.  *Id.*  In this case, the record showed that from 1994 through 2006, the date the Ferrills purchased their last lot, and until 2019 thereafter, no owner of the lake bed objected their use of the lake.

29

The record clearly supports the chancery court's finding of peaceful use.

### F. Continuous and Uninterrupted for Ten Years

¶57. Franco and Vanacor had no personal knowledge and presented no evidence to dispute the Ferrills' testimony of their continuous use of the lake from 1994 until Franco and Vanacor fenced it in 2017. We need not reiterate the extent of this use, including recreational activities, dredging and building a pier, and maintenance efforts when needed. Franco and Vanacor merely argue that the Ferrills had failed to prove specifically how often they used the lake and what portions of the lake they used. Franco and Vanacor cite *Thornton* to support their argument that insufficient proof of sustained use cannot establish a prescriptive easement. But in that case, involving a prescriptive easement in a road, the evidence showed that Thornton only hauled hay or harvested corn a few days a year. *Thornton*, 305 So. 3d at 1180 (¶29). Additionally testimony from other land owners disputed that Thornton had even grown crops in the area at all. *Id*. Thus we affirmed the chancery court's finding that Thornton had failed to submit sufficient proof to establish a prescriptive easement because his use was sporadic. *Id*. at (¶31). The Ferrills, on the other hand, testified to frequent use of the lake over the years. They submitted photographs of various activities using the lake. "It is not necessary, in order to establish an easement by prescription, that the way has been in constant use, day and night, but it may be established by such use as business or pleasure may require." *Rawls v. Blakeney*, 831 So. 2d 1205, 1210 (¶16) (Miss. Ct. App. 2002) (quoting *Browder v. Graham*, 204 Miss. 773, 780, 38 So. 2d 188, 189 (1948)). The Ferrills' testimony concerning their use was consistent with the use of a lake for pleasure. Thus, the

record supports the chancery court's finding of continuous and uninterrupted use for ten years.

¶58. Having reviewed each of the elements required for a claimant to prove a prescriptive easement, and having applied the facts of this case to cases from both Mississippi and other jurisdictions, we find that the record fully supports the chancery court's ruling that the Ferrills had proved with clear and convincing evidence that a prescriptive easement to the use of the lake existed.

> **III. Whether the chancery court erred in finding that the Ferrills were entitled to ownership and a prescriptive easement if they failed to provide a correct legal description of the property at trial or post-judgment as directed by the chancery court.**

¶59. In its final judgment, the chancery court ordered the Ferrills to obtain a legal description of the adversely possessed shoreline property within 120 days of the entry of the judgment so that the court could supplement its ruling with the proper legal description. Prior to the expiration of that 120 days, Vanacor and Franco appealed, and they now argue that the chancery court's judgment should be reversed because the Ferrills failed to introduce proof at trial, or thereafter as ordered, of the "definite area of land" that they allegedly adversely possessed.[10]

---

[10] Despite the inclusion of this prospective provision, the chancery court's judgment was final and appealable. A final, appealable judgment is one that "adjudicat[es] the merits of the controversy which settles all issues as to all the parties" and requires no further action by the lower court. *Walters v. Walters*, 956 So. 2d 1050, 1053 (¶8) (Miss. Ct. App. 2007). In this case, the chancery court adjudicated all claims between all parties thereby eliminating any potential jurisdictional problem. *See* M.R.C.P. 54(b). Moreover, it was not a "conditional judgment," i.e., one that would not take effect until certain conditions are met. *In re Roney*, 139 F.2d 175, 177 (7th Cir. 1943) (comparing such a judgment to a final judgment that "is regarded as final if no further questions can come before the court except

31

¶60.    Franco and Vanacor direct our attention to *Cheatham v. Stokes*, 760 So. 2d 795 (Miss. Ct. App. 2000), for the need of a survey to delineate a claim for adverse possession. However, that case did not require a plaintiff to produce a survey before the court could rule on whether adverse possession could be established; in fact, it held the opposite. *Id*. at 799 (¶24). The parties there disputed the boundary between their two tracts of land. *Id*. at 796 (¶4). The chancery court heard testimony from Stokes, his mother, and his brother concerning the use of the land. *Id*. The chancery court held that the land belonged to the Stokes family by adverse possession. *Id*. Thereafter, "because the old fence was irregularly constructed, and the true boundary could not be identified," the chancery court ordered that a surveyor find the true boundary line. *Id*. at (¶5). On appeal, we affirmed the chancery court's findings. *Id*. at 799 (¶25). We did not, as Franco and Vanacor imply, require a survey be presented before a chancery court could rule on the issue of adverse possession.

¶61.    Moreover, the Ferrills cannot be faulted for not providing the survey within 120 days after the court's ruling because Franco and Vanacor appealed before the Ferrills could meet that deadline. When the notice of appeal was filed, jurisdiction of the case was transferred

such as are necessary to be determined in carrying it into effect).

    In the final judgment in this case, the chancery court described the property that the Ferrills had adversely possessed as "the land running from their property line to the shoreline of the lake." A legal description was not necessary to resolve the claims of the parties. Franco and Vanacor never disputed the boundaries of the property in question, having actually fenced it off themselves. Even though the court ordered the Ferrills to provide a surveyor's description so the property could be described more particularly in a supplemental order, the Ferrills' ownership of the property was not conditioned on the production of the survey. The provision of a survey was merely ministerial and did not affect the court's adjudication of the rights or claims at issue. Thus the court's judgment was final and appealable. A judgment is appealable if the trial court has made a final decision and the only remaining task is merely ministerial.

32

to the appellate court, "divesting the lower court of authority to amend, modify, or reconsider its judgment." *Bert Allen Toyota Inc. v. Grasz*, 947 So. 2d 358, 362-63 (¶7) (Miss. Ct. App. 2007) (citing *McNeil v. Hester*, 753 So. 2d 1057, 1075 (¶68) (Miss. 2000)).[11] Accordingly, we find no merit to Franco and Vanacor's argument that the chancery court's judgment should be reversed for the Ferrills' failure to provide a legal description to the disputed property.

### IV. Whether the chancery court erred in ordering Franco to remove the fence or pay for its removal.

¶62. The chancery court ordered Vanacor and Franco to remove the chain link fence they had erected at their expense within sixty days, or pay damages of $1,800 to the Ferrills to have it removed. Vanacor and Franco argue that the chancery court erred in imposing this obligation on Franco because she allegedly testified that she did not have anything to do with the fence.

¶63. The record reflects that fences around the lake were constructed pursuant to two fence

---

[11] The separate opinion erroneously states that we are holding that the notice of appeal divested the trial court from requiring in its final judgment that the Ferrills provide a legal description of the property in question within 120 days. We are making no such determination because the trial court had full authority to include that provision in its final judgment, which was then appealed. We are merely stating that the Ferrills should not be faulted for not providing the legal description when jurisdiction of the merits of the final judgment passed to the appellate court upon the filing of the notice of appeal. Moreover, the Ferrills presumed failure to do so does not warrant a reversal of the trial court's judgment.

In addition, the separate opinion correctly points out that the Mississippi Rules of Appellate Procedure do provide for the trial court to be involved after a notice of appeal has been filed when an issue arises as to the accuracy of the record on appeal. M.R.A.P. 10(e). However, there was no controversy over the record in this case, and the point is merely academic.

permits. The second permit application, submitted in July 2019, was signed by both Franco and Vanacor. Pursuant to it, Franco and Vanacor fenced the Victoria Street property that the Ferrills had used to access their lots and the lake. It is clear from the record that both are responsible for the second fence, and Franco does not contest her partial liability for the dismantling of that fence. In the application for the first fencing permit, issued in January 2019, Vanacor falsely represented that he owned the lakeshore property when in fact he had deeded it to Franco in November 2018. Franco did not sign the first permit application. Nonetheless, pursuant to that permit, fencing was erected along the shoreline, preventing the Ferrills from accessing the lake from their lots. Because Franco did not sign the first fence application, she now claims that she has no liability for the removal of the fencing erected pursuant to it. We disagree.

¶64. At trial, Franco testified that as the owner of the lake, she feared that she would be liable if someone might fall in and she wanted it fenced.[12] She only denied remembering whether she had instructed Vanacor to construct the first fence. Additionally, Franco

---

[12] Franco testified:

A. It's a -- it's a big -- it's 17, 18 acres, whatever it is, and the insurance -- for you to have that insurance, it's got to be posted off, which was done, and fenced all the way around because it's a big swimming pool. It's a liability, you know. . . . I have liability insurance, and I'm a nervous person, thinking I'm going to get sued because someone is going to fall.
Q. And is that why you wanted the fence put up?
A. What fence? Which fence? There is plenty of the fence.
Q. Well, any of the fence?
A. All of the fence, correct.
Q. Okay. And --
A. It's a liability, yes.

testified at length about the location of the fence and how it had to be built around the Ferrills' office that she claimed was partially on her property. It was the Ferrills' use of that building that she claimed constituted a trespass in her opinion. Her testimony showed that she was aware of the first fencing project, that she benefitted from it, and that she certainly did not object to its construction on property she claimed to own.

¶65. Franco argues that the Ferrills had to prove a principal-agent relationship between herself and Vanacor for her to be held liable for the removal of the fence. However, she clearly ratified Vanacor's actions in the fencing done under the permit he obtained. "Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." *Est. of St. Martin v. Hixson*, 145 So. 3d 1124, 1131 (¶16) (Miss. 2014). "A person ratifies an act by (a) manifesting assent that the act shall affect that person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents." *Northlake Dev. LLC v. BankPlus*, 60 So. 3d 792, 797 (¶14) (Miss. 2011). "[U]nder some circumstances, a principal's inaction can result in ratification, but only where the principal has notice that others will infer from his silence that he intends to manifest his assent to the act." *Id.*

¶66. In this case, the record supports the chancery court's order that Franco as well as Vanacor remove the fence or pay to have it removed. Franco definitely was responsible for the fencing that occurred pursuant to the permit application that she signed, and she ratified the fencing that was done pursuant to the first permit application. It only makes sense that

the parties who trespassed and erected the fence should be held responsible for its removal. Accordingly, there is no merit to this issue.

### V. Whether the chancery court erred in ordering Franco and Vanacor to pay for the fence removal if they acted in good faith and whether the $1,800 cost of removal was supported by the evidence.

¶67. Franco and Vanacor argue that they acted in good faith by obtaining a survey before erecting the fence, and thus the circuit court erred in finding that they had trespassed and in ordering them to remove the fence. They also argue that the Ferrills' proof on the cost of the removal of the fencing was insufficient and that the circuit court erred in assessing damages in the amount of $1,800 if they failed to remove the fence.

¶68. Franco and Vanacor argue they committed no trespass because they thought they owned the land and had a survey done. They cite *Reeves v. Meridian Southern Railway LLC*, 61 So. 3d 964, 968 (¶18) (Miss. Ct. App. 2011), which requires a showing of an "inva[sion] [of] the land of another without a license or other right," and they argue that the land in question here did not belong to the Ferrills until the chancery court ruled that the Ferrills had adversely possessed it. However, the *Reeves* case does not support their argument. In that case, Meridian had placed railcars on a spur located on property it did not own but it had the owner's permission to do so. *Id*. at 966 (¶4). At a time years later when Meridian had six cars on the spur, a subsequent owner of the property installed a lock device on the lead car, trapping all six cars. *Id*. at (¶6). Meridian sued for replevin and the landowners, Reeves and Rega Inc., answered and pled ten counterclaims, including trespass. *Id*. at (¶7). Ultimately, Reeves released the railcars, and the replevin claim was dismissed. *Id*. The circuit court

36

granted Meridian's motion for summary judgment on Reeves's counterclaims. *Id*. On Reeves's appeal of the trespass claim, Meridian contended that it had a good-faith belief that it had the right to use the spur because the prior owner had granted it express permission. *Id*. at 968 (¶20). However, we stated that "[a] trespass is committed even if the trespasser has a good-faith belief that he has a right to enter the land." *Id*. at (¶21). Accordingly, we held that a trespass had been committed. *Id*. at (¶22). Clearly, *Reeves* does not support Franco and Vanacor's good-faith defense.

¶69. Moreover, in this case, the Ferrills' title to the shoreline in dispute matured before Franco and Vanacor even bought the lake. In this case, because the chancery court correctly found that the Ferrills had adversely possessed the shoreline, Vanacor and Franco's construction of the fence did constitute a trespass. According to the adverse-possession statute, Mississippi Code Annotated section 15-1-13(1), the Ferrills' title vested when ten years of actual adverse possession was completed. The Mississippi Supreme Court confirmed this in *Crotwell v. T&W Homes Etc LLC*, 318 So. 3d 1117, 1123 (¶21) (Miss. 2021). That case cited *Taylor v. Bell*, 87 So. 3d 1134, 1138 (¶14) (Miss. Ct. App. 2012), stating that "it is well-settled Mississippi law that once the elements of adverse possession have been satisfied, a full and complete title is vested in the adverse possessor." Moreover, "[t]he requisite intent for a trespass is an intention to enter upon the particular piece of land in question, irrespective of whether the actor knows or should know that he is not entitled to enter." *Okhuysen v. City of Starkville*, 333 So. 3d 573, 582 (¶24) (Miss. Ct. App. 2022). Thus, in this case, title to the land in dispute had vested in the Ferrills before the act of

trespass, to which Franco and Vanacor's claim to have acted in good faith is no defense. It is clear that they both intended to enter on land they did not own in order to erect the fences. Accordingly, the record supports the chancery court's finding that Franco and Vanacor had trespassed.

¶70.    Franco and Vanacor further argue that the Ferrills failed to submit admissible evidence that the cost of removing the fence would be $1,800 and that Mrs. Ferrill's estimate was not sufficient to establish a reasonable cost. However, Franco and Vanacor did not object when Mrs. Ferrill testified to her opinion about the cost. Consequently, they are procedurally barred from raising this issue on appeal. *Brown v. State*, 37 So. 3d 1205, 1212 (¶15) (Miss. Ct. App. 2009) ("A defendant's failure to object to admission of evidence at trial waives his ability to appeal the issue."). Notwithstanding the procedural bar, Franco and Vanacor fail to cite any authority to support their argument that Mrs. Ferrill's estimate was inadmissible. The record showed that she had years of experience in estimating costs of projects, and Franco and Vanacor presented no evidence to challenge the reliability of Mrs. Ferrill's estimate. Moreover, given the findings of the chancery court that the shoreline of the Ferrills' lots did not belong to Franco and Vanacor, the fence obviously had to be removed. Mrs. Ferrill's estimate was clearly helpful to the court in fashioning its remedy. Accordingly, we find no error in the chancery court's use of Mrs. Ferrill's testimony concerning the cost of deconstructing the fence, to which Franco and Vanacor did not object.

> **VI.    Whether the chancery court erred in ordering Vanacor to pay expenses for the removal of the Ferrills' pier.**

¶71.    The chancery court found that "the evidence supported Ferrills' claim of trespass

38

against Roddy Vanacor in removing the decking from the piers belonging to the Ferrills and denying them access to the lake." The court ordered Vanacor to pay the Ferrills $5,000 for the damage to the piers. To challenge the chancery court's findings, Vanacor raises the same arguments he and Franco made on the preceding issue—namely, that he had a right to go onto the shoreline property because he had a survey showing the property did not belong to the Ferrills. We have already discussed and decided that this argument holds no merit in paragraphs 69 and 70 above.

¶72.     Vanacor then argues that it was Mr. Ferrill who trespassed onto the lake when he first constructed the pier and because the pier constituted an obstruction and nuisance, Vanacor had the right to remove it without becoming a trespasser. Vanacor cites *Lindsey v. Shaw*, 211 Miss. 333, 49 So. 2d 580 (1950), as support. In that case, the Mississippi Supreme Court upheld the right of a prescriptive easement holder to remove overgrown tree branches that interfered not only with travel, but even with persons walking along the roadway. *Id*. at 339; 49 So. 2d at 583-84. The Mississippi Supreme Court said these obstructions rendered the easement "practically useless and constitute an unreasonable interference" with the easement holder's use. *Id*. at 339, 584. The Court said that the overhanging tree branches were an obstruction and a nuisance, authorizing the owner of the easement to remove it. *Id*.

¶73.     In this case, the Ferrills' pier was not a nuisance in the sense that *Lindsey* describes. There was no showing that it interfered with Franco's use of the lake or that the pier's demolition was necessary for Franco to use the lake. Under *Lindsey*, Vanacor had no legitimate reason to trespass onto the Ferrills' property and destroy the pier. Accordingly,

we find no error in the chancery court's ruling that the Ferrills should be paid the value of the destroyed pier as damages.

¶74. Nor did the chancery court err in utilizing Mrs. Ferrill's estimate of the cost of replacing the pier as damages. In *Check Cashers Express Inc. v. Crowell*, 950 So. 2d 1035, 1043 (¶21) (Miss. Ct. App. 2007), we held that the cost of a new air conditioning system to replace the operable one that prior owners had taken when they moved was an appropriate method of computing damages. In this case, because the pier was removed, the chancery court properly used its replacement cost as damages.

¶75. Vanacor's argument that Mrs. Ferrill's estimate was insufficient proof of the replacement cost has no merit. First, Franco and Vanacor raised no objection to Mrs. Ferrill's testimony concerning her estimate. Thus, they are procedurally barred from raising it as an issue on appeal. *Brown*, 37 So. 3d at 1212 (¶15). Moreover, the record showed that Mrs. Ferrill had worked for years in her husband's marine construction business, which included the construction of piers. It was her job to estimate costs of such projects for customers. Her unrebutted estimate was useful to the court in determining the damages in this case.

### VII. Whether the chancery court erred in dismissing Franco's claim for trespass.

¶76. Franco argues that the chancery court should have awarded her at least nominal damages for the Ferrills' trespass onto the waterfront property she claimed to own. No in-depth analysis of this argument is required because we have found that the record adequately supported the chancery court's ruling that the Ferrills had title to the shoreline property of

their lots by adverse possession, and Franco did not. "A trespass to land is committed when a person intentionally invades the land of another without a license or other right." *Edwards v. Williams*, 292 So. 3d 586, 595 (¶53) (Miss. Ct. App. 2019). Here, Franco owned no land that the Ferrills invaded, and the chancery court did not err in dismissing Franco's claim for trespass.

**Conclusion**

¶77. Because the record adequately supports the chancery court's findings in this case, we affirm its holding that the Ferrills adversely possessed the waterfront property of the lots they owned, that the Ferrills had proved a claim of prescriptive easement to the use of the lake, and that the Ferrills were entitled to $5,000 in damages for Vanacor's trespass onto their property and the destruction of the pier they had built. Further, we affim the chancery court's order that Franco and Vanacor remove the fence they erected within the time allotted or pay $1,800 to the Ferrills for them to remove it. Finally, we affirm the chancery court's denial of Franco's claim of trespass.

¶78. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY LAWRENCE, J.**

**McCARTY, J., CONCURRING IN PART AND IN RESULT:**

¶79. I fully agree with the majority's conclusion finding a prescriptive easement in favor of the Ferrills. However, I must respectfully disagree with two components of the opinion.

¶80. First, the majority finds that "[w]hen the notice of appeal was filed, jurisdiction of the

41

case was transferred to the appellate court," which it determines divested the lower court from then including the proper legal description of the Ferrills' property. *Ante* at ¶61. However, the express language of our Rules of Appellate Procedure vest the power to correct or modify a record with the trial court: "If any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted to and settled by *that court* and the record made to conform to the truth." MRAP 10(e) (emphasis added). It is then exclusively the province of the trial court to correct or modify a record. *See Wilson v. Greyhound Bus Lines Inc.*, 830 So. 2d 1151, 1156-57 (¶15) (Miss. 2002) (finding that "[t]he trial court did not abuse its discretion by denying [an appellant's] proposed record corrections").

¶81.    Furthermore, "[i]f *anything material* to either party is omitted from the record by error or accident or is misstated in the record, the parties by stipulation, *or the trial court*, either *before or after* the record is transmitted to the Supreme Court or the Court of Appeals, or either appellate court on proper motion or of its own initiative, may order that the omission or misstatement be corrected, and, if necessary, that a supplemental record be filed." MRAP 10(e) (emphasis added).

¶82.    So while I agree that this attack by Vanacor and Franco is fruitless, it is because the alleged failure to add the property descriptions to the record does not impact the trial court's ruling in any way—not because the material could not be added after the filing of the notice of appeal.

¶83.    Second, I am fully convinced by the facts of this case that the Ferrills had a

prescriptive easement to the use of the lake. Our current test for prescriptive easement has been established for many years. "To acquire property by adverse possession or by prescriptive easement the claimant must show that the possession was: (1) open, notorious, and visible; (2) hostile; (3) under claim of ownership; (4) exclusive; (5) peaceful; and (6) continuous and uninterrupted for ten years." *Biddix v. McConnell*, 911 So. 2d 468, 475 (¶18) (Miss. 2005). There is nothing in this test that applies exclusively to land, and the test can be applied to the lake in this case as well. For that reason I do not join the majority's examination of law from other states, which spans paragraphs 45 through 49. However, I agree with the result that the prescriptive easement was properly found under the facts of this case.

**LAWRENCE, J., JOINS THIS OPINION IN PART.**